## Jenkins *against* Eichelberger.

A contract by a merchant to deliver hides to a tanner, to be charged at cost and five per cent commission, and interest after six months, and when tanned to be returned to the merchant to be sold by him, and out of the proceeds of the sale the first cost and five per cent to be deducted, and the balance to be paid to the manufacturer, is such a sale as will subject the hides to levy and sale as the property of the manufacturer.

The law will allow of no device to elude the principle which forbids a lien to be created on chattels as a security separate from the possession.

ERROR to the district court of *York* county.

This was an action of trover by Thomas C. Jenkins against Adam Eichelberger and others.　The facts were these: the plaintiff, who is a merchant in the city of Baltimore, delivered to James Osborn a quantity of hides upon the following terms.　" The hides were to be charged at cost and five per cent commission, and interest after six months, and when tanned, to be returned to the plaintiff, and by him sold, and out of the proceeds of sale the plaintiff to deduct the price agreed upon for the hides and five per cent commission and guarantee on the sale, and to pay the balance to Osborn."　The hides were taken to Osborn's yard and put into vats.　Judgments were afterwards obtained against Osborn, and executions issued, upon which the hides were levied on and sold by the defendant, who was the sheriff.　The other defendants were the judgment creditors, who had indemnified the sheriff.

The court (Durkee, president) charged the jury, that the plaintiff was not entitled to recover; and a verdict and judgment were rendered for the defendants.

*Lewis*, for plaintiff in error, contended, that the contract did not vest a property in the hides in the manufacturer; and that trover was the proper form of action; and cited, 1 *Chit. Pl.* 171.

*Evans*, contra, cited, 2 *Pick. Rep.* 122; 3 *Pick. Rep.* 255; 2 *Stark.* 838; 2 *Saund.* note 47, *b*; 4 *Wash. Rep.* 387; Putnam *v.* Wiley, 8 *Johns. Rep.* 432; 3 *Vern.* 302; 2 *Am. Com. Law Rep.* 143; *Bac. Ab.,* tit. *Trespass, C., pl.* 2; Jackson *v.* Martin, 10 *Johns.* 383; 3 *Pick.* 55.

The opinion of the Court was delivered by

GIBSON, C. J.—An important, if not a decisive feature of the case is, that the hides were charged at cost, with five per cent commission, and interest after six months.　So far the transaction appears

IV.—Q

distinctly in the garb of a sale, at a profit of five per cent and a credit of six months.   The plaintiff would doubtless have been willing to sell without stipulating for a re-sale, provided the purchaser had substituted cash for it, or satisfactory security.   What had he principally in view?   Undoubtedly to part with the property at a given profit; to effect which, required but an ordinary sale; and the transaction certainly took that shape in the first instance, the ulterior arrangements having respect but to security for the price.   Annexed to the principal contract was an accessory agreement that the hides, when tanned, should be returned to the plaintiff and re-sold by him; and that the proceeds should be paid to the manufacturer, " the *price* agreed upon for the hides," as it was aptly but significantly called, together with five per cent for commission and guarantee being first deducted.   Now, what was the purpose of all this?   Not to give the plaintiff the rise of the market, for he was to have no interest in it. If it were any thing but security for the price of the raw material, what was it?   Not to reserve a further profit in the shape of commission for re-sale and guarantee of solvency, for that was ostensibly to be but compensation for the risk and trouble.   But *why a* commission for selling the plaintiff's own goods; and why a guarantee of solvency if the sale were not on account of the party to be secured by it?   The very provision indicates not only that the sale was to be on account of the manufacturer, but that it would otherwise have been at his risk.   It will scarce be thought that he might not have entitled himself to dispense with the sale by payment or tender of the original price.   Most certainly he might have done so by tendering enough to cover the additional commission.   The only plausible objection to it is suggested by the want of a corresponding stipulation on the part of the manufacturer to make good the difference, should the proceeds of the manufactured article fall below the price of the raw material.   The truth seems to be that such a *contingency* was not anticipated, for its occurrence was barely *within the range* of possibility.   A depression of the market sufficient to counterbalance the increase of value from the labour of the manufacturer, was in the last degree improbable; and to provide for it would have been an excess of caution.   The hides were charged as in the ordinary case of a sale; and if the subsequent proceeds of them to be put to the manufacturer's credit, were less than the debit, he would, of course, have remained liable for the difference on the original contract: and this without any particular stipulation to that effect.   In the ordinary case of materials worked up for the owner, which this is erroneously said to be, the artisan has a fixed price, or at least a *quantum meruit*, for his labour.   Not so where what is more properly a profit than a compensation is to depend on the product of a sale; and where, *if he be not essentially the owner of the article, it is not* easy to comprehend how he can be legitimately affected by the state of the market.   Can we shut our eyes to the true nature of the transaction so as not to see that it was in substance a sale; and that the

[Jenkins v. Eichelberger.]

re-sale was a device to elude the wholesome principle of the common law, which forbids a lien to be created on chattels as a security separate from the possession? / There is no reason why the vendor of the raw material should be secured to the detriment of the public, or in preference to the manufacturer; and if both cannot be so, the contract must be construed in a way to make it consist with rules of policy for the suppression of fraud, by uniting the ownership to the possession./ It will scarce be thought that the vendor's creditors could have deprived the manufacturer of the fruit of his labour by an execution. Yet he certainly would have been exposed to that contingency, had he not been an owner, at least to the extent of the increased value. But he could be a part owner only on the basis of a partnership resulting from an agreement to furnish raw material on the one side, and labour, as well as skill, on the other, the profits being ascertainable and divisible in definite proportions, by means of the re-sale. But profits are contingent, and there is nothing to indicate that the prime cost and commission were viewed as such, or to show that contingent losses were to be borne equally, by the material and labour put in as stock. By the express terms of the agreement, the price of the hides was to be paid out of the proceeds of the re-sale, in the first place; and community of profit and loss is a primary condition of the contract of partnership. But to declare the manufacturer a partner, would equally sustain the judgment, as it would justify the execution. But it is impossible to see how the plaintiff can have been either a joint or separate owner. If the effect of the contract were even doubtful, the construction of it would be influenced by considerations of policy./ To tolerate a lien severed from the possession by any device whatever, would be pregnant with all the mischiefs of colourable ownership; and to sanction it at the expense of the community, could be justified but by the accomplishment of more important objects than individual accommodation. Policy and fair dealing require the courts to be as unsparing of transactions, whose effect is to impart a delusive credit or protect the property of debtors from their creditors, and to be as regardless of devices and forms, as they have ever been of transactions prohibited by the statutes of usury. The resources of ingenuity are inexhaustible; and to give entire effect to principles of policy, it is necessary to look at substance without respect to form. It is said that this species of transaction is so prevalent, that an immense amount of property will be affected by our decision. So much the more urgent is the demand for its suppression. If the dealers in raw hides themselves cannot trust the tanners, they certainly cannot expect that they will be suffered to secure the benefit of their custom by means which may induce others to trust them. Such were the means resorted to here; and whether the form of the action were well or ill chosen, it is sufficient for the purposes of the judgment, that the attempt to cover the property from the creditors of the vendee, is prohibited by policy and statute.

Judgment affirmed.