RAUBER *et al.* v. SUNDBACK *et al.*

1. Where the evidence leaves a question of fact in dispute, doubt, or uncertainty, such fact should be determined by the jury.
2. A fact is legally in dispute when its affirmation and its denial are each supported by competent evidence of some probative force; evidence which, standing alone, undenied and unexplained, would naturally and logically lead a reasonable mind to a definite conclusion as to the exist or non-existence of such fact.
3. Where the rights of the parties depend upon an agreement between them, and such agreement can only be gathered from statements and expressions used by them in letters and conversations which are apparently conflicting and inconsistent with each other, it is the duty of the jury and not of the court to find from all the evidence what the agreement really was.

(Syllabus by the court.   Argued April 4, 1890.   Opinion filed Oct. 13, 1890.)

Appeal from circuit court, Minnehaha county.   Hon. FRANK AIKENS, Judge.

Action to recover possession of certain personal property levied on by the defendants by virtue of certain warrants of attachment.   There was judgment for defendant.   Plaintiff appeals.   Reversed.

The facts so far as material are stated in the opinion.

*U. S. G. Cherry*, for appellants.

Where there is any evidence before the jury, whether weak or strong, tending to prove a plaintiff's case, it is error for the court to direct a verdict for defendant.   Hickman v. Jones, 9 Wall. 197; Pence v. Langdon, 99 U. S. 578; Insurance Co. v. Doster, 106 U. S. 30; Railroad v. Stout, 17 Wall. 657; Colt v. Railroad, 49 N. Y. 671; Baker v. Woodruff, 2 Barb. 520; Reed v. Deerfield, 89 Mass. 522; Aylwin v. Ulmer, 12 Mass. 22; Lewis v. Pratt, 48 Vt. 358; Sabotta v. Insurance Co., 54 Wis. 87; Matthews v. Elevator Co., 51 Mo., 149; Bank v. Rhutasel, 25 N. W. 261; Bowersock v. Winters, 14 N. W. 121; Wilson v. Railroad, 62 Cal. 164.   The contract between the plaintiffs and defendant McMillan was a parol contract in part and its interpretation was for the jury.   McDowell v. Shotwell, 2 Whar. 25; McFarland v. Newman, 5 Watts, 59; Harper v. Kean, 11 S. & R. 278; Edwards v. Goldsmith, 16 Pa. St. 43.

An agreement to place goods in the hands of an insolvent for sale upon the terms of his paying to his principal the invoice price of the goods and retaining the overplus for himself is not fraudulent; nor does it vest in the agent an ownership that is subject to levy and sale.   McCullough v. Porter, 4 Watts & S. 177; Pam v. Vilmor, 54 How. Pr. 235; Nutter v. Wheeler, 2 Lowell 346; Walker v. Butterick, 105 Mass. 237; Brouthers v. Davis, 47 Ia. 363; Bank v. Daniels, 47 N. Y. 631; Blood v. Palmer, 26 Am. Dec. 547. The fact that at the end of a specified time the agent could become a purchaser of the goods does not change the nature of the transaction into a sale on credit.   Porter v. Pettengill, 12 N. H. 294; Enlow v. Cline, 79 Pa. St. 488; Marston v. Baldwin, 17 Mass. 605; Marquette v. Jeoffrey, 13 N. W. 592; Budlong v. Cottrell, 20 N. W. 166.

*Boyce* and *Boyce*, for respondent, Sundback.

It is the duty of the court to direct a verdict whenever it would be warranted in setting aside a contrary verdict as not justified by the evidence.   Knapp v. Bank, 5 Dak. 378; Schofield v. Railroad, 114 U. S. 615; Railroad v. Bank, 123 U. S. 727; Pleasants v. Fant, 22 Wall. 116; Hyatt v. Johnson, 91 Pa. St. 200; Songstad v. Railroad, 5 Dak. 517; Oscanyan v. Arms Co., 103 U. S. 261.

The transaction between the plaintiffs and defendant, McMillan amounted to a sale of the goods in question.   Fish v. Benedict, 74 N. Y. 613; Jenkins v. Eichelberger, 4 Watts 121; Johnston v. Browne, 37 Ia. 200; Lyon v. Lenon, 4 Western Rep. 461; Lonergan v. Stewart, 55 Ill. 44; McArthur v. Wilder; 3 Barb. 66; Bastress v. Chickering, 18 Ill. App. 198.

KELLAM, J.   The appellants are manufacturers and wholesale dealers in boots and shoes in the city of Rochester, N. Y. The respondents McMillan & Co. were retail dealers in the same kind of goods in the city of Sioux Falls, S. D., and the respondent Sundback, sheriff of Minnehaha county in which said city is situated.   This action is to recover possession by appellants; as their property, of a lot of boots and shoes, levied upon and taken possession of by said respondent Sundback, as

such sheriff, by virtue of certain warrants of attachment against the property of respondent McMillan. The goods in controversy were shipped by appellants to respondent McMillan. and were in his store at the time of the levy.

The precise question presented on the trial below was whether respondent McMillan actually bought the goods in controversy from appellants, and so became the absolute owner of them, making them subject to attachment for his debts, or whether he held the goods on "consignment" or commission only, being really the property of appellants Rauber & Siebert, and consequently not liable for McMillan's debts. At the close of the plaintiff's testimony the court directed a verdict in favor of defendant Sundbank, McMillan having made no defense. Upon this verdict judgment was entered, and a subsequent motion for a new trial denied. From this action of the court the plaintiffs appeal. While appellants' assignment alleges many errors in detail, the central question towards which they all converge is this. Did the trial court do right in withdrawing the case from the jury, and directing a verdict in favor of the defendants?

Under the strong light of the many modern adjudications upon the general question of when the court may or should interpose its authority, and withdraw a case from consideration by a jury, there is little necessity or excuse for any attempt to formulate new rules for the guidance of trial courts. Under our system of jurisprudence it is the undoubted province of the jury to determine disputed questions of fact. A fact is legally in dispute when its affirmation and its denial are each supported by competent evidence of some probative force; evidence which, standing alone, undenied and unexplained, would naturally and logically lead a reasonable mind to a definite conclusion as to the existence or non-existence of such fact. In Finney v. Railroad Co., 3 Dak. 270, 16 N. W. 500, where this was the controlling question in the case, the court in its opinion says: "The modern rule of the supreme court of the United States in relation to the power of the court to direct the verdict is thus: When the judge is clear of doubt that a verdict ought to be ren-

dered either for the plaintiff or the defendant, and that it would be his duty to set a contrary one aside, he ought to instruct the jury so to find.   On the other hand, such a direction cannot be properly given to the jury unless the evidence is such as to leave no room for doubt that it is the duty of the jury to find accordingly."   In Orleans v. Platt, 99 U. S. 678, the court says:   "It is well settled in the jurisprudence of this court that, if the facts are clearly established and are undisputed, it is competent for the court to give such a charge;"   and the complement of the rule is expressed with equal clearness in Kelly v. Railroad Co., 70 Mo. 608.   "But when the facts are disputed, or the credibility of witnesses is drawn in question, or a material fact is left in doubt, or there are inferences to be drawn from facts proven, the case under proper instructions should be submitted to the jury."   These cases undoubtedly express the modern and present sentiment of the courts upon this question, and declare with distinctness the governing rule in such cases.

In this case the ultimate question being tried was, who was the owner of the goods in controversy, appellants or McMillan? It was conceded and understood that they formerly belonged to appellants, and were shipped by them to McMillan, and the question of ownership depended upon the character of the transfer. Was it a sale or a bailment?   Did McMillan absolutely buy the goods, or did he take them as the property of the appellants, to be sold on commission?   This must depend upon the intention of the parties.   There was considerable testimony in the case bearing with more or less force and directness upon this point.   It appears from the abstract that in April, 1888, appellants had sold goods to McMillan which were not promptly paid for, appellant Rauber testifying:   "We drew on McMillan for the amount, and made two or three drafts which were not paid until two or three or four weeks after presentation."   Afterwards, October 3d and 19th of the same year, appellants shipped the goods which are the subject of this litigation to McMillan, on an order taken by their agent Whitman.   Referring to this second order, appellant Rauber testifies:   "We inquired as to the responsibility of E. McMillan & Co. before

shipping the goods. We inquired from Mr. Whitman and Dun's Mercantile Agency. We then satisfied ourselves that McMillan & Co. were not responsible. Mr. Whitman advised us they were not responsible. This was some time between April and October. He took the order shipped in October personally. We thought them responsible for a small amount." The October order was not all shipped at once. Appellant Rauber, in his cross-examination, says: "When the order of October, 1888, came, we had not the goods on hand. We made them up from the order. Only part of the order was shipped October 3d." The invoice accompanying the October 3d shipment was on the printed bill-heads of appellants, reciting: "Bought of S. Rauber & Siebert." This was printed. Immediately following the word "Terms," also printed, were written: "On consignment, account to be settled inside four months." At the foot of the invoice of goods is the following: "Mr. Whitman will call on you the latter part of November. Will talk matter over with you. Also will ship bal. of order as soon as possible; hoping this will be satisfactory to you." The balance of the order was shipped October 19th, invoiced on same printed bill-heads, with the writing opposite "Terms" as on previous invoice: "Consignment. This account have to be settled inside four (4) months." Mr. Rauber further testifies: "We sent him the amount of $588 on consignment. (being the shipment of October 3d.) He refused the balance of the order on consignment. We made them up and shipped them on consignment After shipping these lots of goods, Mr. Whitman, our agent, called on McMillan. He made some changes in lot Exhibit B,—in place of four months six months; and that all goods sold by McMillan were to be paid every thirty days, and the balance at the expiration of six months. The full amount was to be paid; and the goods on consignment as bill called for. McMillan has never remitted any money on either of these consignments." In his cross-examination he testifies as follows: "Question. Up to that time [the shipment of October 3d] had anything been said by either party about shipping on consignment? Answer. Yes, sir. Q. In what way, by letter? A. Yes, sir. Q. By

whom written?  A.  Either by Whitman or Mr. Siebert, my partner.  Q.  Was any letter written on the subject by McMillan?  A.  Yes, sir.  Q.  How many?  A.  One or two.  Q.  Please produce those letters and the ones written by Whitman and Siebert.  A.  I cannot.  I have not got any of them here.  Either McMillan has got them or Mr. Cherry."

This evidence as to the letters aids us little except to show that the matter of consigning the goods instead of selling them had been a subject of correspondence between them;  but whether McMillan in any manner assented to it is not disclosed, as the letters do not appear in evidence, unless McMillan's letter of September 15th, hereinafter referred to, is one of them; but Rauber testifies as above quoted: "We sent him the amount of $588 on consignment, and he refused the balance of the order on consignment.  We made them up and shipped them on consignment."  Prior to the shipment of October 3d, to wit, September 15th. McMillan wrote appellants:  "I do not like the consignment plan.  You may send the shoes mentioned in your letter that are already started in the factory, and if you can make the balance and ship them by October 20th, on the terms they were bought on, all satisfactory.  If not, please cancel the balance of the order."  Afterwards Whitman, appellant's agent, called on McMillan, and as to what then occurred he testifies as follows:  "I called on McMillan about the 26th day of November.  I found all the goods in his store.  Some of them unpacked.  The majority of them unpacked.  Question.  Now, will you state what agreement or arrangement, if any, you entered into with Mr. McMillan at that time in regard to these goods?  Answer.  The goods were shipped subject to my coming here.  My calling on him was on that business at that time  *  *  *  My calling on him at that time was in pursuance of the arrangement made by Rauber & Siebert that I should call on him the latter part of November, and make satisfactory arrangements.  Q.  Now, state that conversation.  A.  I told him that the firm did not feel satisfied in filling the goods, or have him keep the goods in any other way than under

consignment.   After I told him  that, I told him the best thing
I could propose would be for him to accept the goods  on  con-
signment; that I would grant him an extended  time,—that is,
I wanted him to make a  payment, from the 1st of January,
every thirty days, on what goods had been sold, but at the ex-
piration of six months we would insist on the goods being paid,
or we would want a final settlement,  or  we  would want the
goods back, because we would  not  make  a  second  shipment
without the first one's being fully paid; that he would have to
pay for them every thirty days, for what goods had been sold.
He was perfectly satisfied, and accepted the goods  under  that
condition, and I so notified the house by return mail.   Q.   Was
there anything said as to the  commission?   A.   Of course; it
was understood.   Q.   State, Mr. Whitman, what, if anything,
there was said in regard to the sums which were to be returned
to the house.   A.   He was to remit every thirty  days  the  in-
voice price, and the balance that he could get over  and  above
that would be his own commission. ' Q.   Was  there  anything
said as to your taking back the goods  before the  six  months?
A.   Yes, sir; we reserved the right to  retake the goods at any
time.   I told him that the goods  were  ours.   We  would  take
the right to take the goods 'back at any time that we  saw  fit."
In his cross-examination he says:  "When I came  here  about
the 26th of November, I found  McMillan in his store.   Part of
the goods were unpacked.   I should think  the  first  shipment.
The second shipment I know were in  the  boxes.   They  were
in the rear part of the store.   They were nailed up in the boxes.
The unpacked goods were on the shelves with his other goods.
I told him that I came out to see him  about  this  shipment.   I
told him that the house would enter into  no  other  agreement
except on the consignment plan, and  that I would give him, as
far as I was concerned, a little more time from  what  the  firm
had.   The firm had given him no time, so far as actual time was
concerned.   They had given him a certain privilege.   Question.
There was nothing said as to the  time  he  was  to  have,  was
there, up to 'that time?   Answer.   There was  on  the  bill.   Q.
Then they had given him time on the bill?   A.   No, they had not

given him as far as that was concerned, because they left it entirely to me.   Q.   I will ask you as a matter of fact whether or not, in the bill sent, if they did not give him three or four months' time.   Is that the bill? (indicating.)   A.   Yes, sir. Q.   Now, state what time is given on that bill.   A.   There is four off in thirty days if he discounts it and takes it on consignment.   Q.   Four off in thirty days?   A.   Yes, sir.   Q. Four off for cash, isn't that?   A.   Yes, sir.   Q.   In thirty days?   A.   Four off in thirty days.   If he preferred paying it in thirty days, they would take four off,—give him that privilege.   Q.   And he had four months' time if he wanted to take it?   A.   No, sir, he had four months' limited time to make a settlement.   Q.   What was your conversation with McMillan? A.   I told him I would make it a little better for him.   *   *   * I would give him up and from the first day of January as the first thirty days to make his payment, and so on every thirty days until six months were up, when we would want a final settlement.   Q.   Final settlement for the goods?   A.   For the goods.   He would have to pay for them then, or we would take them back.   *   *   *   McMillan paid the freight on those goods. I don't know whether there was any insurance on the goods. I didn't require any insurance on the part of McMillan.   I didn't have any conversation with McMillan in regard to any deduction of price or any damages by reason of the goods being shop-worn that were not sold."   In the cross-examination of appellant Rauber appears the following:   "Question.   By the terms of sale of the bill of goods shipped in October, were McMillan & Co. to pay the full amount of the bill at the end of six months?   Answer.   They were to pay it on consignment that way.   They were shipped on consignment at four months. Afterwards, they were changed by Mr. Whitman to six months. Q.   Did you look to McMillan to pay for the entire shipment of October 3d and 19th at the expiration of four and six months from the date of shipment, whether McMillan & Co. had sold all the goods in the mean time or not?   A.   I expected to have it paid in six months on consignment, because the goods would get shelf-worn, and of less value.   He was to pay every thirty

days for what he had sold. Q. That arrangement for paying every thirty days was not to commence until January 1, 1889? A. I believe so; yes. That was for all the goods that he had at the time on consignment. Q. In case·that McMillan sold none of the goods, would you have demanded the full amount named in Exhibits A and B at the expiration of four and six months? A. We would if he was good for it. If not, we would take our goods back." On the 6th day of December, McMillan sent this telegram to appellants: "Had to mortgage stock. Your goods not included. Don't worry."

· I have thus endeavored to collate and fairly state all the evidence bearing upon the question presented, to-wit, the intent and understanding of the parties, and as to their relations, respectively, to the goods in controversy. I think it tends to show an unwillingness on the part of appellants to ship the goods to McMillan, except upon commission, and an unwillingness on the part of McMillan to so receive them, he so advising appellants, by his letter of September 15th; that, notwithstanding his letter, the goods were shipped, both invoices being plainly marked in writing, "On consignment." So far as these invoices are inconsistent in their terms, on account of the use of the words "Bought," and "On consignment," and to the extent of their independent force, if they have any, intending to show the final agreement under which these goods were held by McMillan, the latter, being writen for this particular contract, would prevail over the former, being printed for general use. This rule is too familiar to require the support of authorities. 2 Pars. Cont. (6th Ed.) 516. On and by the first invoice, appellants advised McMillan that Whitman would call on him in November, and talk the matter· over. What matter was referred to? It might have been the disagreement as to the terms of shipment. This may not be very material, except as tending to show that, up to that time, the parties had not agreed upon terms. Whitman testifies that when he arrived in Sioux Falls he found all the goods unsold, and the second shipment still in the boxes unopened; that he then made an arrangement with McMillan in regard to the goods, the details of

which have already been noticed; and that such arrangement was satisfactory to and accepted by McMillan. He testifies that the agreement so accepted by McMillan was in part that he should keep the goods on consignment; that after January 1st he should make payment every 30 days for what goods had been sold; that he should remit the invoice price, and that whatever he sold any goods for in excess should be his commission; that the goods were to remain the property of appellants, subject to be retaken at any time. It is claimed by respondent, and it may be true, that other conditions of this agreement as testified to by Whitman are inconsistent with an agreement to sell on commission. If so, it only increases the difficulty of ascertaining the real intent and understanding of the parties. Subject to the same remark is the answer of appellant Rauber in his cross-examination, to the effect that, if McMillan had sold none of these goods at the expiration of the time limited for settlement, they would have demanded the full amount, if he was good for it; if not, they would have taken their goods back. The answer sheds little light upon the subject of inquiry, for it seems upon its face not only inconsistent with itself, but equally inconsistent with the commission theory of appellants, and the sale theory of respondent. The first part of the answer indicates Rauber's understanding that, at the expiration of the time limited for settlement, they might demand pay for the goods, whether sold or not, the second part, that the goods were still theirs, and might be retaken, if not paid for. The meaning of McMillan's telegram in regard to the mortgage is not free from doubt: "Had to mortgage stock. Your goods not included. Don't worry." By "Your goods" did he mean, as claimed by respondent, the goods bought of them, or, as claimed by appellants, goods which he understood belonged to them?

Upon the whole it seems to us very plain that the real intent and understanding of the parties to this agreement must be gathered from a variety of sources; some affording direct and definite evidence; others indirect, indefinite, and possibly inconsistent and confusing. It must be determined to some ex-

tent, at least, from statements and expressions, the meaning of which seems doubtful and obscure.  These expressions must be analyzed and compared, not only with each other, but with other statements as to the agreement, if there are any, which are more definite and certain.  By this means only could the final fact as to what agreement these parties made—its scope and meaning—be intelligently determined.  This being our conclusion as to the condition of the evidence, it follows that in our judgment the question should have been submitted to the jury, with a plain instruction from the court as to what agreement would constitute the transaction a bailment, and what a sale.  Of the cases cited in respondent's brief, Fish v. Benedict, 74 N. Y. 613; Bastress v. Chickering, 18 Ill. App. 198; and Jenkins v. Eichelberger, 4 Watts, 121,—are inapplicable to this case, so far as the distinct question now presented is concerned, because in each of those cases the agreement upon which the rights of the parties depended was in writing, and there was and could be no doubt or question as to its terms, and it was plainly the duty of the court to construe it, and declare whether it constituted the transaction a sale or a bailment.  But here the very matter in doubt and dispute is, what did the parties agree to? and to find and determine what that agreement really was, its terms and extent was a question of fact for the jury, on all the evidence; its force and legal effect a matter of law for the court.  The other cases cited by respondent were where grain had been deposited with a warehouseman, and the question there, as here, was:  Was it a sale or a bailment?  But in those cases the undisputed testimony showed, and it was not questioned, but conceded, that the agreement never contemplated that the specific article which was the subject of the agreement should be retained by the bailee, or purchaser, or that such specific grain should be returned in case of demand, but that other grain of the same kind and quality might be returned in its place.  Thus the very fact which, in the opinion of the court, tested and determined the character of the transaction, was not in doubt or dispute.  In these cases, as in those just previously noticed, the

terms of the agreement were definite, clear, and unambiguous, and that is the marked and significant distiction between those cases and the one at bar. We think the case, with proper instructions from the court as to what constituted a sale, and what a bailment, should have been submitted to the jury. The judgment of the court below is reversed, and the case remanded. All the judges concurring.