JULIUS BASTRESS ET AL.

v.

CHARLES F. CHICKERING.

1. BAILMENT AND SALE.—When the identical thing delivered is to be restored in the same or an altered form the contract is one of bailment, and the title to the property is not changed; but when there is no obligation to restore the *specific* article, and the receiver is at liberty to return another thing of equal value or the money value, he becomes a debtor to make a return, and the title to the property is changed; it is a sale.

2. OSTENSIBLE OWNER OF CHATTELS—RIGHTS OF CREDITORS.—Where one party, by means of contract but without notice to the world, suffers the real ownership in chattels to be in himself and the ostensible ownership to be in another, the law will postpone the rights of the former to those of the execution or attachment creditors of the latter, because, to injure third per-

Bastress v. Chickering.

sons by giving a false credit to such ostensible owners, is the natural and probable result of the transaction.

3. CONTRACT.—The court is of opinion that the contract in this case was not one of bailment or of principal and factor, and that although the form of agreement was that of consignment for sale, its real purpose was to cover up a sale and preserve a lien in appellee.

APPEAL from the Superior Court of Cook county; the Hon. ELLIOTT ANTHONY, Judge, presiding. Opinion filed January 6, 1886.

This was replevin in the *cepit* and *detinet*, brought February 7, 1883, by appellees, Chickering & Sons, against Pelton, Pomeroy & Cross, and also against appellant Bastress, an execution creditor of the latter, and Hanchett, the sheriff, for seventeen Chickering pianos. Pelton, Pomeroy & Cross, making no defense, were defaulted. Bastress, the execution creditor, and Hanchett, the sheriff, pleaded the general issue: Property in Pelton, Pomeroy & Cross, and Hanchett, a special plea of justification as sheriff, setting up a regular writ of *fieri facias* issued February 7, 1883, out of the Superior Court of Cook county, directed to him as such sheriff, upon a judgment of said court, of that date, in favor of said Bastress and against said Pelton, Pomeroy & Cross, for $10,252 damages and $7.50 costs; that in virtue thereof he, as said sheriff, then and there seized said goods and chattels, averring that they were the property of said defendants in said judgment and execution, concluding with a verification. To which plaintiffs replied, traversing only the averment as to the goods being the property of Pelton, Pomeroy & Cross. Issue being joined, there was a trial resulting in a verdict, finding all the issues for the plaintiffs. The court, overruling appellant's motion for a new trial, gave judgment on the verdict. Hence this appeal.

It appears that Chickering & Sons, plaintiffs below, had, for a long time prior to the transaction in question, been manufacturers, in the city of New York, of pianos known by their name; that for some two years prior to October 14, 1882, Pelton, Pomeroy & Cross had been carrying on a general music

store in Chicago in their own names as owners, and had been accustomed to buy for said business musical instruments, etc., from other parties as well as from plaintiffs; that said house in Chicago had been of long standing before Cross became a partner; did a large business and had a good reputation financially and otherwise; but that, in fact, the firm had become financially embarrassed prior to October 14, 1882; had borrowed large sums of money of one Tainter, for which he held the firm's judgment note for $41,000; that the execution creditor, Bastress, was ignorant of that fact, and from time to time, after as well as before that date, lent to said firm sums of money, so that February 6, 1883, the amount borrowed of him amounted to $10,252. The evidence tends to show that Cross put no capital into the firm, and that for some reason he was zealously interested in behalf of Chickering & Sons; that he, without the concurrence of either Pelton or Pomeroy, but co-operating with the Chickerings, prepared for execution the following agreement, which was in fact executed October 14, 1882, but antedated as of August 31, 1882, Cross signing it for his firm. It was signed in duplicate and is as follows:

"This agreement entered into this 31st day of August, 1882, between the co-partnership of Chickering & Sons, of New York City, parties of the first part, and the co-partnership of Pelton, Pomeroy & Cross, of the City of Chicago, parties of the second part, witnesseth:

"The parties of the first part, at the request of the parties of the second part, agree to forward and deliver on consignment to the parties of the second part, all pianos of the manufacture of the parties of the first part that the last named parties may determine that the parties of the second part may need in their business in Chicago, at rates and prices to be agreed upon and specified in the invoices of pianos, forwarded as aforesaid; said pianos to remain the exclusive property of the parties of the first part, and to be sold for them and on their account by the parties of the second part.

"And the parties of the second part agree to pay all freight charges and costs of shipment of pianos consigned to them, and also keep them fully insured for the parties of the first

Bastress v. Chickering.

part, and pay all insurance premiums thereon ; and to accept and receive said pianos only on consignment, as aforesaid, and sell and dispose of them only for and on account of the parties of the first part.

"And it is agreed, that the parties of the second part, as compensation, and in full for all charges, commissions, expenses, compensations, and claims of every nature against the parties of the first part, by reason of such consignment shall have all moneys received by the parties of the second part for the parties of the first part for the sale of such pianos, over and above the prices at which such pianos shall have been consigned ; and all moneys so received by the parties of the second part, shall be regularly remitted to the parties of the first part, less the sums the parties of the second part are entitled to retain under this agreement; and the moneys so remitted shall be credited and allowed in payment and discharge for the particular piano or pianos the same was received by the parties of the second part in payment for.

"All advances that may be made by said consignees to said consignors by negotiable paper shall be credited on and for the particular piano or pianos they were made upon, but only when such negotiable paper shall have been paid and not before, and such advances, until paid in full, shall transfer no title to said consignees.

"All pianos consigned as aforesaid shall be subject to the order of the parties of the first part, and their right to transfer, remove, sell or re-possess themselves of the same at any time, and without notice.

"The parties of the first part shall have the right to fix at any time, or in any case, the amount of advance to be made by the parties of the second part by negotiable paper, on consignments, and to fix the time on such negotiable paper, and may end this agreement at any time."

It appears from the evidence that, although Pelton, Pomeroy & Cross were from time to time borrowing money from Bastress after said agreement was made, yet he was kept ignorant of its existence. It also appears that for two years prior to that agreement, the plaintiffs had been selling and

delivering pianos to Pelton & Co. on credit, the usage being for the latter firm to give the former notes covering the aggregate prices of those delivered during the month, at the end thereof; and that among those so sold and delivered were two which were in the store of Pelton & Co. at the time of the agreement and were among those replevied. There was nothing to indicate any change in the manner or character of the business of Pelton & Co. after the said agreement, which plaintiffs and Cross kept secret, except that the word "consigned" was written across each invoice of pianos shipped. All of said invoices, under which those in question were delivered, except as to number and prices, were as follows:

"The following conditions are agreed to as a statement of the relative positions and rights of Chickering & Sons and their agents. The 'agents' of this firm are its customers, who are engaged in selling its pianos in the territory allotted to them. Such customers are not 'agents' in any sense known to the law, having no authority to bind said Chickering & Sons, or to incur liability on their account. The Messrs. Chickering & Sons will take care of their own warranties of pianos, whenever requested, by making repairs, or authorizing them to be made, if justly chargeable. 'Agents' are not at liberty to make or procure repairs at the expense of Chickering & Sons without permission. The agency may be terminated at any time, by either party, unless a written contract exists."

"It is agreed that the pianos specified in this bill are bought and sold upon the conditions herein set forth."

"Pelton, Pomeroy & Cross,

"To Chickering & Sons, Dr."

Then followed the pianos, with style and number and price, in the usual form of a bill of goods sold, but across was written the word "consigned."

The evidence tended to show that, at the end of each month, Pelton, Pomeroy & Cross made and sent their promissory notes to Chickering & Sons, for all the pianos received by the former of the latter during the month, and accompanied by said form of invoice, the same as had been done prior to said agreement, and that they had paid, in cash, $1,000.

The evidence tended to show that Pelton, Pomeroy & Cross were in failing circumstances in January, 1883 ; that an agent of Chickering & Sons then came to Chicago, and Cross went through the form of turning over to said agent the pianos in question, but the latter left them in the possession of Pelton, Pomeroy & Cross, the same as they had previously been ; that on the morning of Feb. 7, 1883, the same form was repeated, but there was no visible change of possession, and they were then and there taken upon the execution aforesaid, in favor of Bastress ; that said agreement, which was in fact made Oct. 14, 1882, was dated as of August 31, 1882, so as to cover pianos which had been sold and delivered by Chickering & Sons to Pelton, Pomeroy & Cross, and were in the possession of the latter, as purchasers, at the time said agreement was made, and so remained thereafter.    There was evidence tending to show, and sufficient to go to the jury, that said agreement was in fact made with the intent, on the part of the parties making it, to hinder, delay and defraud the creditors of said Pelton, Pomeroy & Cross, by conferring upon said firm the *indicia* of ownership of the pianos, and thereby give them a false credit, while Chickering & Sons should retain to themselves a secret lien thereon, whereby they could, in case of danger from the creditors, through said agreement and the friendliness of Cross, keep the other creditors at bay.

At the instance of plaintiffs, the court gave to the jury the following instructions :

3d. "If, from the evidence, the jury believe that in the month of January, 1883, the said plaintiffs, by their agent, P. J. Gildemister, came to Chicago for the purpose of having a settlement with the said defendants, Pelton, Pomeroy & Cross, and then made a demand upon said Pelton, Pomeroy & Cross for the pianos involved in this suit, and if, at the said time, the said Pelton, Pomeroy & Cross acknowledged to the said P. J. Gildemister that the said pianos were not their property, but belonged to said plaintiffs, or would be held by them, subject to the order of said plaintiffs, and that said pianos were the property of the plaintiffs at said time, then the jury are instructed that they must find the issues for the plaintiffs."

4th. "If, from the evidence, the jury believe that on the 7th day of February, 1883, P. J. Gildemister, acting as the agent of the plaintiffs, called at the store of the defendants, Pelton, Pomeroy & Cross, in Chicago, and made a demand for the pianos involved in this suit, and said pianos were at that time the property of the plaintiffs in this case, and were then turned over by the said Pelton, Pomeroy & Cross to the said plaintiffs, and checked off by them at that time, and, if they further believe from the evidence, that at said time the said defendants, after turning over the said pianos to the said plaintiffs, stated that they held them for the plaintiffs, subject to removal, then the jury will find the issues for the plaintiffs, unless they shall find that the execution issued in favor of the defendant Bastress against the said Pelton, Pomeroy & Cross was placed in the hands of the sheriff of Cook county before the said pianos were so turned over to the said plaintiffs by the said defendants, Pelton, Pomeroy & Cross, if the jury shall find that they were so turned over as above stated."

5th. "If, from the evidence, the jury believe that the pianos involved in this suit were sent on consignment by the said plaintiffs to the said defendants, Pelton, Pomeroy & Cross, and were held by them on consignment and in no other manner, and were not paid for by the said defendants, Pelton, Pomeroy & Cross, and that the said pianos were the property of the said plaintiffs, and that the said plaintiffs had the right, at any time, to make a demand for the removal of the same, then it made no difference whether the same were in the possession of the said Pelton, Pomeroy & Cross or in the hands of the sheriff, under the execution issued in favor of the defendant Bastress, if said pianos were the property of the plaintiffs; and if the jury shall find, from the evidence, that the pianos were so held upon consignment, and had not been paid for, they will find the issues for the plaintiffs."

6th. "The jury are instructed, that if the plaintiffs in this case shall show that the pianos involved in this suit were sent upon consignment by the plaintiffs to the defendants, the burden of proof is upon the defendants to show that the said pianos were paid for by the said defendants, or that the said consignment agreement was modified, changed or abrogated."

Bastress v. Chickering.

Mr. H. W. MAGEE, for appellants; that an unrecorded agreement between parties, whereby the title to personal property remains in one, while the possession and all the *indicia* of ownership with the right of sale is given to another, whereby others are induced to give credit, is void in the State of Illinois as against *bona fide* creditors, and amounts to a sale as far as they are concerned, and the property covered would be subject to levy by an execution creditor, cited Thornton v. Davenport, 1 Scam. 296; Kitchell v. Brattan, 1 Scam. 300; Morris v. Grover, 2 Scam. 528; Rhines v. Phelps, 3 Gilman, 464; Jennings v. Gage, 13 Ill. 614; Reed v. Eames, 19 Ill. 596; Thompson v. Yeck, 21 Ill. 74; Brundage v. Camp, 21 Ill. 330; Read v. Wilson, 22 Ill. 381; Ketchum v. Watson, 24 Ill. 591; Bay v. Cook, 31 Ill. 336; Brownell v. Dixon, 37 Ill. 197; Mc-Cormick v. Hadden, 37 Ill. 371; Bell v. Farrar, 41 Ill. 404; Butters v. Haughwout, 42 Ill. 29; Murch v. Wright, 46 Ill. 488; M. C. R. R. Co. v. Phillips, 60 Ill. 190; Western Union R. R. Co. v. Wagner, 65 Ill. 197; Young v. Bradley, 68 Ill. 553; Ticknor v. McClelland, 84 Ill. 474; Allen v. Carr, 85 Ill. 388; Lucas v. Campbell, 88 Ill. 449; Sibley v. Tie, 88 Ill. 286; Latham v. Sumner, 89 Ill. 233; Van Duzor v. Allen, 90 Ill. 499; Rozier v. Williams, 92 Ill. 189; Martin v. Wirts, 11 Bradwell, 572.

Messrs. LYMAN & JACKSON, for appellees; as to goods sent upon consignment, cited Gray v. Agnew, 95 Ill. 315; Fairbanks v. Malloy, 16 Bradwell, 281; Warner v. Martin, 11 Howard, 209; Ins. Co. v. Kiger, 103 U. S. Supreme Court Reports, 352; Alexander v. Tomlinson, 40 Ark. 216; Chicago Taylor P. P. Co. v. Lowell, 60 Cal. 454; Ballard v. Bergot, 40 N. Y. Reports, 314; Coville v. Hill, 4 Denio, 323; McNeal v. Tenth National Bank, 46 N. Y. 325; Story on Agency, 113; McCreary v. Gaines, 55 Texas, 485; Thompson v. Borman, 49 Iowa, 392.

McALLISTER, J.    Whether or not there was actual fraud on the part of the Chickerings, plaintiffs below, and Cross, in entering into the agreement in question, was a question of

fact for the jury, and which they have negatived by their verdict.

But the question as to what was the real object or purpose of the parties to that agreement, whether it was designed to cover a sale of the pianos from the Chickerings to Pelton, Pomeroy & Cross, and under the label or device of a consignment for sale, to preserve in the vendors a lien upon the goods, or whether it constituted a contract of bailment, were questions to be determined by the court, upon a construction of the instrument, fairly considering all its provisions, with the view of finding therefrom what was the real intention of the parties. Those, undoubtedly, are pure questions of law. Murch v. Wright, 46 Ill. 487; Hervey v. Rhode Island L. Works, 93 U. S. 664; Heryford v. Davis, 102 U. S. 235; Fish v. Benedict, 74 N. Y. 613.

As pertinent to those questions, we may briefly state that the contract provides: 1. That the prices at which Pelton, Pomeroy & Cross were to take the pianos of the Chickerings, were to be agreed upon and expressed in the invoices. 2. Pelton & Co. were to pay out of their own pockets all freight charges and costs of shipment, to keep them insured for the benefit of the Chickerings, the former paying the premiums. 3. Pelton & Co. were at liberty to sell the pianos at such prices as they chose to fix upon them, and to have all they could get over and above the invoice prices in full for all charges, commissions, expenses, etc. When they sold one or more they were to remit the invoice price to the Chickerings, and that should be in payment and discharge for the pianos so sold. 4. Advances might be made by Pelton & Co. by negotiable paper, and when such paper was paid, it should transfer the title to the particular pianos for which such paper was given. 5. All pianos delivered by the Chickerings to Pelton & Co. were subject to the order of the former and their right to transfer, remove, sell or re-possess themselves of the same, at any time, without notice.

The last clause we regard as in the nature of the insecurity clause usually inserted in chattel mortgages. Is this a contract of bailment? It is well settled in this State, that

when the identical thing delivered is to be restored in the same or an altered form, the contract is one of bailment, and the title to the property is not changed; but when there is no obligation to restore the *specific* article, and the receiver is at liberty to return another thing of equal value, or the money value, he becomes a debtor to make a return, and the title to the property is changed ; it is a sale. Lonergan v. Stewart, 55 Ill. 49, and authorities there cited ; Richardson v. Olmstead, 74 Ill. 213. Sir William Jones, in his work on Bailments, 2d Ed., 102, says : "It may also be proper to mention the distinction between an obligation to restore the specific things, and a power or necessity of returning others equal in value. In the first case it is regular bailment ; in the second, it becomes a debt."

It is indisputable, that under the contract in question, Pelton & Co. were vested with the power and right of discharging themselves from any further obligations as respected all the pianos mentioned in any one invoice, by paying to the Chickerings the negotiable promissory note given therefor, but which, for the purpose of disguising the real nature of the contract, is therein called an "advance." In our opinion, it was not a contract of bailment, and the provisions authorizing Pelton & Co. to determine solely for themselves at what prices they would sell the pianos from their store, is almost conclusive that in reality they were not acting as the agents or factors of the Chickerings; but that, with the further provision that they were to bear as their proper burden all the expenses of shipments, etc., the same precisely as purchasers, would leave no doubt that the contract was not one of bailment, or of principal and factor.

The form of the agreement was that of consignment for sale, but its real purpose was to cover up a sale and preserve a lien in the Chickerings, for the price of the pianos. The invoices used are in perfect harmony with this view. They contained conditions which were to be considered as agreed to, and one of them was: "The agents of this firm (Chickering & Sons) are its customers, who are engaged in selling its pianos in the territory allotted to them. Such customers

are not agents in any sense known to the law," etc. . Then follows: " It is agreed that the pianos specified in this bill are bought and sold upon the conditions herein set forth." It is true that the word "consigned" was written across the bill. but there is no magic in that word which can take from the transaction its real character.

In Thompson v. Pratt, 94 Penn. St. 275, the court says: " Whatever the form of the agreement, if its purpose was to cover up a sale and preserve a lien in the vendors for the price of the goods, it was void as respects creditors, whether the credit was given before or after the delivery of the goods. A consignment for such objects is no better than any other device." The same view was taken in Murch v. Wright, *supra*, where the device was a pretended lease. So also in Hervey v. Rhode Island Locomotive Works, *supra*. The cases cited are authority for the doctrine that where one party, by means of contract but without notice to the world, suffers the real ownership in chattels to be in himself, and the ostensible ownership to be in another, the law will postpone the rights of the former to those of the execution or attachment creditors of the latter, because, to injure third persons by giving a false credit to such ostensible owners, is the natural and probable result of the transaction. Rose v. Story, 1 Barr, 190 ; Martin v. Mathiot, 14 Serg. & R. 214; Stadfeld v. Huntsman, 92 Penn. St. 53 ; Brunswick v. Hoover, 10 Weekly Notes of Cases, 219.

We are of opinion that the agreement in question was void as respects Bastress, the execution creditor, and the sheriff, for the reasons just stated.

It follows from the views expressed that the third, fourth, fifth and sixth instructions to the jury, given for plaintiffs below, were erroneous. In each, the third, fourth and fifth, the construction and effect of the written contract in question were submitted to the jury, and by the sixth its validity is directly assumed. The third and fourth declare the effect of Cross turning over the pianos in question to plaintiffs' agent in January, and again Feb. 7, 1883 ; but in neither is there any hypothesis as to any new agreement, independent of that in

writing, or of any change of possession.   Ketchum v. Watson, 24 Ill. 591.

The judgment below will be reversed and the cause remanded.

ON REHEARING.—On rehearing March 31, 1886, a rehearing having been granted in this case, we have reconsidered the various questions involved with all the care and patience practicable, but are unable to reach conclusions different from those arrived at upon the first hearing.   The judgment will, therefore, be reversed for the reasons stated in the opinion heretofore filed, and the cause remanded.

Judgment reversed.