THE NATIONAL BANK OF AUGUSTA *v.* GOODYEAR *et al.*

1. The facts appearing in the bill of exceptions and transcript of the record showing that the goods in controversy were not embraced in the mortgage, and that the bill of sale, the consideration of which was only one hundred dollars, could not have been intended to embrace, in addition to the mortgaged goods, other goods worth or estimated to be worth over fifteen hundred dollars, it follows that neither the mortgage nor the bill of sale embraced the goods in controversy.

2. The evidence warranted the judge, to whom the facts as well as the law of the case were referred, in finding not only that these documents did not in fact embrace the goods in controversy, but that the bank at the time of taking the bill of sale was chargeable with notice that the goods now in controversy were consigned goods and therefore not intended by the mortgagor, its debtor, to be either mortgaged or sold.

3. A contract by the terms of which one person agrees to receive goods on consignment to be sold by him as the agent of another, monthly reports of sales and of goods on hand to be made, the goods to remain on consignment as the property of the consignor until paid for in full by the consignee, and all proceeds of sale to belong to the consignor until he is paid the invoice price in cash, which is to be done for each article as soon as sale of it is made,

and with no provision whatever for the acquisition of title to the goods by the consignee, is not a contract of sale but of bailment and agency for the sale of goods, notwithstanding the contract provides, that the compensation of such consignee shall be whatever he shall receive, upon sale of such goods, as surplus over the price named in the contract; that if any of such goods be removed from his place of business they shall be paid for immediately; that he shall keep the goods insured for the benefit of the consignor, and shall pay freight, safely store, keep in good condition and hold them free from all charges and taxes, and assume all risk of loss or damage from any cause whatsoever; a further stipulation being that on failure of the consignee to sell in a reasonable time, or on his failure to comply with any condition of the contract, then the agency shall terminate at the option of the consignor, and goods remaining unsold are to be subject to his order free from all charges.

(*a*) That the invoices which accompanied the consigned goods said they were sold, some of them stating "terms contract," others, "terms contract" and "terms spot cash," others, "terms when sold," and one "terms ......," would not necessarily negative the theory that all the goods were merely consigned, and none of them sold to the consignee.

4. The nature of the contract was not varied or waived as to the goods remaining unsold, by the acceptance of notes instead of cash for some of those which had been sold. After a sale by an agent which entitles his principal to a cash payment, the principal may take the agent's notes in lieu of cash without converting the agent into a purchaser of the goods, if he was in fact an agent to sell at the time the sale was effected.

5. The contract providing that under certain circumstances therein stated, "all goods remaining unsold in said second party's hands, are to be subject to the order of said first party, free of all charges," and the undisputed testimony showing that the circumstances existed which entitled the consignor (the first party) to avail itself of this provision, it follows that there was nothing due from the consignor to the consignee on account of expenses paid by the latter on the goods remaining unsold, which are the goods now in controversy. Hence there was no error in not finding anything in favor of the bank or anyone else, on account of such expenses paid.

January 23, 1893.

Debtor and Creditor. Notice. Mortgage. Contract. Bailment. Agency. Before Judge RONEY. Richmond superior court. February 23, 1892.

On December 16, 1891, A. W. Goodyear executed a

mortgage to the National Bank of Augusta, the Emerson & Fisher Company, Caroline E. Goodyear, and a number of other parties, all of whom were creditors of the mortgagor in various amounts. The mortgage recites that the mortgagor is indebted to the National Bank of Augusta $3,700, represented by five notes of dates running from October 22d to November 14th, 1891, some due at thirty and some at sixty days; that he is indebted to the Emerson & Fisher Company $1,092.44, of which $880.67 is due on open account, and the balance is represented by notes dated October 8th, and December 10th, 1891, and due December 25, 1891, and January 12, 1892; that he is indebted to Caroline E. Goodyear $3,538.43, represented by note dated October 1, 1891, and payable one day after date; and that he is due the other creditors therein named certain specified amounts. The aggregate of all the indebtedness set forth in the mortgage is stated to be $10,870.25, for the purpose of securing which indebtedness the mortgage is made upon all that stock of goods, wares and merchandise contained in the mortgagor's stores in Augusta, it being intended to cover every article and thing contained in said store belonging to the mortgagor, as well as all notes, accounts, choses in action and other claims due him. The mortgage was recorded on December 17, 1891. On that day the mortgagor made to the National Bank of Augusta, in consideration of $100, a bill of sale to the property covered by the mortgage, this bill reciting that notice of the mortgage is given, which mortgage is not to be in any way merged or affected by this conveyance to the bank. The bill of sale was recorded on December 18, 1891. On December 19th, the National Bank of Augusta brought its petition praying for receiver to take charge of and sell the property in question, holding the proceeds of sale until further order of the court; for decree apportion-

ing the proceeds of the property among the several mortgagees, paying over to the bank the share of Caroline E. Goodyear who had assigned to it her interest as collateral security; and for judgment in favor of the bank against the mortgagor, and against Caroline E. Goodyear as indorser of his notes, for any balance that might be found to be due. Upon this petition the judge granted a rule against the other mortgagees to show cause why the relief prayed for should not be granted, and appointed a receiver to take charge of the property, make an inventory of the same and make sales at retail, holding the proceeds subject to further order, etc.

On February 23, 1892, the Emerson & Fisher Company brought its petition praying for an order directing the receiver to deliver to it certain described property in his possession, alleging that this property was not the property of the receiver nor of A. W. Goodyear, but the property of petitioner; that it was held by A. W. Goodyear on consignment under the terms of a contract between him and petitioner; that it never was the property of A. W. Goodyear, did not pass under the mortgage or bill of sale, nor was it intended so to pass either by the mortgagor or by the purchaser and seller, but is the property of the petitioner. A rule to show cause why this petition should not be granted was served upon the bank, the receiver and other mortgagees, and the matter was submitted to the judge to pass upon all questions of law and fact.

On the hearing appeared the contract between the Emerson & Fisher Co. of the first part, and A. R. Goodyear, agent for A. W. Goodyear, of the second part, dated August 21, 1890, by which the party of the first part appoints the party of the second part as it agent for the sale of carriages and buggies of its manufacture, said work to be held as a consignment. " All proceeds from the sale of said work to belong to party of

the first part until the invoice price is paid in cash, as herein provided. In consideration of such agency, party of the second part agrees to take, as compensation for such sales, the surplus over and above the contract price herein named, and when sold remit for same at the prices herein agreed upon, f. o. b. at Cincinnati, Ohio. Party of the second part agrees to receive, pay freight, safely store and keep in good condition such work as may be consigned, holding the same free from all charges and taxes; insuring said property in the name and for the benefit of first party; assuming all risk of loss or damage from any cause whatsoever. To remit in cash the contract price of each vehicle sold, as soon as sold, to said first party or their authorized agent, without any deduction for freight or exchange, and to make monthly reports of sale and goods on hand on the first day of each month; agreeing that goods consigned under this contract shall be paid for immediately if removed from the place of business where consigned by party of first part, and until such goods are paid for in full by said party they shall remain on consignment as property of party of first part, subject to all the conditions of this contract. It is further agreed that if said second party fails to sell said work within a reasonable time, or fails to settle and pay in full, or fails to make reports, or fails to comply with any of the conditions of this contract, then this agency shall terminate at the option of the party of first part, and all goods remaining unsold in said second party's hands, are to be subject to the order of said first party, free of all charges. Prices agreed upon at a discount of 50 and 5 per cent. from catalogue price-lists for 1890 and 1891. Terms, when sold."

The secretary of the Emerson & Fisher Co. swore, that the property in question is not the property of A. W. Goodyear and was not at the date of the mort-

gage, but is and was the property of the Emerson & Fisher Co., the goods being held by A. W. Goodyear on commission under the contract of consignment; and that the title to the same has never passed from the company to any other person. A. R. Goodyear swore, that he was actively employed as agent and general manager of A. W. Goodyear at and before his failure, and was well acquainted with the affairs of the firm; that the goods in question are a part of the goods con · signed to A. W. Goodyear under and by virtue of the contract of consignment, and were never included in the mortgage; and that the title to them has always been and is now in the Emerson & Fisher Co., and has never passed and never was intended to pass to another person. A. W. Goodyear swore, that at the time of his failure and before giving the mortgage to the bank, he had on consignment a large number of vehicles, the property of the Emerson & Fisher Co. and others, which goods were not included in the mortgage; and that at the time of the delivery of the mortgage to the bank, he notified it that he had goods on consignment. The receiver swore, that he had examined carefully the property in question which had been identified by the secretary of the Emerson & Fisher Co.; that from information derived from the officers of that company he believes that the property was consigned to the mortgagor and under the consignment contract; and that in his opinion it should be delivered to that company.

The bank introduced the testimony of its president, showing that its debt as specified in the mortgage, arose in the following manner: On February 7, 1891, the bank loaned A. W. Goodyear $500 on his note indorsed by his aunt, C. E. Goodyear, upon the representations of his father and agent, A. R. Goodyear, that the aunt owned the property where they all lived, and that A. W. Goodyear owned the stock in trade in the store where

he did business, which stock the agent represented was of the value of $10,000 with no liens thereon, but that he owed the purchase money for some portion thereof, and needed the amount then asked for to be used in this business.  On the same representations the bank loaned A. W. Goodyear $1,000 on April 6th, $500 on April 16th, $1,000 on May 28th, and $1,000 on June 5th, 1891, which debt has been reduced and is now represented by the $3,700 mentioned in the mortgage.  These notes were renewed from time to time until December 17, 1891, when $2,400 fell due.  The bank determined to enforce the payment of this sum, when it was called upon by A. R. Goodyear and J. S. Davidson, his attorney, who told the president of the bank that A. W. Goodyear had the evening before executed the mortgage and that it had been delivered and was being recorded at the court-house, said Goodyear further stating that the stock was worth sufficient to pay off the mortgage debt of $10,700, but in view of the stringency of the times it might not bring more than $10,500, and offered to sell out absolutely to the bank for $100 subject to the mortgage, which offer was accepted, the sale made, the money paid, and the bank took possession of the stock under the bill of sale.  Goodyear further stated, that his son owed, as the mortgage showed, some consignment accounts, but other than as therein shown the bank had no knowledge of their names or amounts. Goodyear further stated that there was still some consignment property on hand to a small amount, not over $500, but did not state the names or character thereof; and the bank bought the entire stock for full value and without notice of the rights of petitioner, and A. W. Goodyear was the general agent of petitioner in making said sale and had full power to sell the goods.  Afterwards the bank, finding that complications would likely arise as this intervention sets forth, filed its bill to fore-

close the mortgage and have an officer of the court sell the property. The receiver having been appointed took an inventory of the stock, and found that it amounted to $7,007.54. After the sale aforesaid and pending the making of the inventory, A. R. Goodyear set apart from the stock what he claimed was consigned property, and which is not included in the inventory. A part of this consigned property is that set out in the petition of the Emerson & Fisher Co., upon the faith of the ownership of which by A. W. Goodyear the bank loaned its money, it having caused the records to be examined and no liens having been found against A. W. Goodyear, in accordance with the statement made by his agent A. R. Goodyear. A. R. Goodyear is a man of large experience in the carriage business of many years standing. A. W. Goodyear is a young man without any such experience. A. R. Goodyear failed some years ago; his wife, mother of A. W. Goodyear, failed within the last two years; and the father has really been doing business in the name of the son. The contract with the Emerson & Fisher Co. is really a conditional sale of the goods delivered thereunder, but it has never been recorded, and no notice was ever acquired by the bank of the fact until the execution and delivery of the mortgage and the filing of the same for record. The parties to the contract did not conduct their business in accordance with its terms, but A. W. Goodyear failed to remit the cash for sales, as is manifest by the mortgage; he also sent the Emerson & Fisher Co. his notes and paid interest thereon, which were accepted by that company, and this action constituted a waiver of any rights under the contract. A. W. Goodyear has paid large sums of money in freight, storage, taxes and insurance upon said property, and really owns the same under the contract. The only interest of the Emerson & Fisher Co., if the contract is valid and legal as against the bank, is to sell the

goods at the prices named, all excess to go to A. W. Goodyear and as such into the hands of the receiver as the property of the bank. The failure to record the contract and the mingling of the goods in the stock of A. W. Goodyear gave him a false credit and misled the bank into giving him credit as above stated.

The receiver further swore, that he made the former affidavit when not fully informed as to the true condition of the account between the Emerson & Fisher Co. and A. W. Goodyear, nor as to the action thereunder by the parties thereto; that he is familiar with the custom of trade incident to such shipments as disclosed by the contract, by which custom and the contract as understood in the commercial world, the contract is no longer binding between the parties, they having waived the same by a failure to comply strictly with its terms, in that the Emerson & Fisher Co. received Goodyear's notes for sales made, instead of the cash as referred to therein; and that from the books of Goodyear it appears that he has expended $242.25 in freight, storage and other expenses on the property. A. W. Goodyear further swore that he did not state to the bank the amount or character of the consignments on hand; that his statement as to this matter was not made until December 17, 1891, after the sale of the stock had been agreed upon, the mortgage having been delivered on the previous day to J. S. Davidson, attorney for all parties, at ten P. M.; that he sold goods received from the Emerson & Fisher Co., and did not remit them the cash, but sent his notes in payment thereof, which notes they accepted and sent him a receipt therefor, some of which notes he has paid; that none of the notes he gave have been returned, save those he has paid, and those named in the mortgage are still outstanding and never have been returned to him, nor has any demand ever been made upon him for the amount of goods sold and not

paid for prior to the mortgage, and which is the amount named in the mortgage; and that he sold to the bank the property set out in the bill of sale of December 17, 1891. No notes outstanding for goods specified in application of the Emerson & Fisher Co., now on trial. A. W. Goodyear's books showed that he had received goods of the value of $4,731.37 from the Emerson & Fisher Co., had paid it $2,089.91 on account, and owed it $2,641.46, of which sum $1,092.44 is the debt secured by the mortgage, and the balance is represented by the goods claimed by the Emerson & Fisher Co. The headings of the invoices from the Emerson & Fisher Co., under which goods were consigned by them, were introduced. These were dated September 19th and October 25th and 29th, 1890, and April 27th, 1891. Five of them stated: "Sold to A. R. Goodyear agent, terms, contract." Three stated: "Sold to A. R. Goodyear, Esq., terms, contract," and "terms, spot cash." Six others stated: "Sold to A. R. Goodyear agent, terms, when sold." One stated, "Terms........." It was admitted by the Emerson & Fisher Co. that it had received notes from time to time from A. W. Goodyear in payment for goods sold by him under the contract, which notes had been paid except two, and these two were not for the goods now in dispute but for former cash transactions.

It was contended for the Emerson & Fisher Co. that the title to the goods in question was in it, and not in Goodyear or the receiver; that the contract was a consignment contract and had not been novated; that no notes were taken for these goods; that the contract was severable and not entire; that the taking of notes for cash balances due on other goods in the ordinary course of business did not make a new contract; that the contract allowed and required the price of each vehicle sold to be remitted as soon as sold, also monthly reports of

sales; and that this was the intention of the parties. The bank contended that as between the parties thereto the terms of the contract were waived by their dealing with each other, and it was no longer of force as against the rights of the bank; that it was in effect a conditional sale, and not having been recorded, it was of no validity as against the bank as a *bona fide* purchaser and creditor without notice; that the relation between the parties thereto was that of vendor and purchaser and not of principal and agent, it not being a simple consignment contract; that the bank had extended credit upon the faith of the property being owned by A. W. Goodyear and his representations to that effect, and without knowledge of the secret rights of the Emerson & Fisher Co.; that the property was included in the mortgage; and that the Emerson & Fisher Co., by placing a lot of goods in Goodyear's store, greatly increased the value of the stock and gave him a false credit before the commercial world, and could not now recover said goods as against the rights of innocent third persons who loaned money on the faith of their being Goodyear's property, and then bought and took possession of them. The judge decided that the receiver should deliver the property in question to the Emerson & Fisher Co. The bank excepted.

F. H. MILLER and W. K. MILLER, for plaintiff in error.

LEONARD PHINIZY and J. S. & W. T. DAVIDSON, *contra.*

BLECKLEY, Chief Justice.

1. It is clear from the facts appearing in the bill of exceptions and transcript of the record, when closely scrutinized, that the mortgage executed by Goodyear to the bank, together with the Emerson & Fisher Company and several others of his creditors, did not embrace or cover the goods now in controversy. And it is equally clear that the bill of sale subsequently

v 90 46

executed by him to the bank alone, was not designed or understood to cover this disputed property in addition to the property embraced in the mortgage; for the consideration of the bill of sale, as shown upon its face, was only one hundred dollars, whereas the value of the property now in question was certainly very considerable and was probably over fifteen hundred dollars. The purpose of the bill of sale was to pass the mortgaged property to the bank, subject to the mortgage, that is, to make the bank owner of the equity of redemption. With this purpose the small consideration of one hundred dollars would have some consistency, but it would have none at all (supposing the transaction to be honest and *bona fide*) with a design to convey to the bank not only the equity of redemption in the mortgaged goods, but the absolute ownership of about fifteen hundred dollars' worth of property besides. It was known that Goodyear had failed and was apparently insolvent. He was in no condition honestly to part with assets for less than one tenth of their value, even if they had been his own and he had been willing thus to sacrifice them. Looking alone to the descriptive terms contained in the mortgage, the general words embraced therein, superadded to various articles specifically enumerated, are comprehensive enough to cover every item of property belonging to the mortgagor contained in the two stores referred to, namely, 704 Broad street and 703 Ellis street, but the parol evidence shows that although the articles now in controversy were in those stores, the mortgagor recognized the fact that they were not his property but were consigned goods, and did not intend either to mortgage or sell them. He is strongly corroborated by the fact that while the consignor, the Emerson & Fisher Company, is one of the mortgagees, the debt to that company, a debt partly by notes and partly by account, as described in the mortgage includes

none of the price or value of the consigned property which was on hand when the mortgage was executed. It is easy to believe that Goodyear did not intend to mortgage to that company what he regarded as its own property without increasing his previous debt by enough to cover some proper amount for purchase money of the same property. How could he rationally or honestly do such a thing? There is no evidence that at the time of making the mortgage he represented himself to be the owner of these specific goods or held them out as his own. Nor did he do so at the time of executing the bill of sale.

2. The parol evidence was also sufficient to warrant the presiding judge, to whom the facts as well as the law were referred, in finding that the bank at the time of taking the bill of sale was chargeable with notice that these goods were consigned goods, and consequently that the mortgagor did not intend to deal with them as his own either by mortgage or sale. In giving notice to the president of the bank, the value of the consigned goods may have been understated, but this did not excuse the president from inquiring as to what the goods consisted of, and to whom they belonged. He certainly had notice that there were consigned goods, and he could not have understood that he was purchasing any of these whether they were worth little or much. The bank did not purchase any consigned goods, and consequently acquired no title to these goods merely by reason of Goodyear having power and authority from the Emerson & Fisher Company to sell them in the general market. Goodyear did not intend to sell them, and the bank, or the person who represented the bank, could not rightly have believed or understood that he so intended. The real disappointment of the bank was that the consigned goods turned out to be a much larger proportion of the stock than was expected. But the true proportion was

easily ascertainable, and would have been ascertained if the bank had exercised the diligence to which the notice it received was a sufficient prompting. Failure to inquire further was the sole reason why more facts did not become known.

3. The theory of the bank being that the goods in controversy are covered both by the mortgage and the bill of sale, and that theory, as we have just ruled, being unsupported by the evidence, there is, perhaps, no absolute necessity for deciding at present upon the contention, that although Goodyear acquired no title to these goods as against the Emerson & Fisher Company which he could assert, he did acquire a title which his creditors could assert so as to subject them to the payment of any debt which he contracted whilst the goods were in his possession. The question, however, has been fully argued, and we will consider it. This contention is founded upon the terms of the written contract between Goodyear (made by his father as his agent) and the company. An abstract of that contract appears in the official report, and its stipulations are briefly indicated in the third head-note prefixed to this opinion. The bank contends that failure to record the contract rendered the property covered by and delivered under it subject to be charged with the debts of Goodyear. The requirement as to recording is found in section 1955(a) of the code, and reads thus: "Whenever personal property is sold and delivered with the condition affixed to the sale, that the title thereto is to remain in vender of such personal property until the purchase price thereof shall have been paid, every such conditional sale, in order for the reservation of title to be valid as against third parties, shall be evidenced in writing and not otherwise. And the written contract of every such conditional sale shall be .executed and attested in the same manner as is now provided by exist-

ing laws for the execution and attestation of mortgages on personal property: Provided, nevertheless, that, as between the parties themselves, the contract as made by them shall be valid, and may be enforced whether evidenced in writing or not. The existing statutes and laws of this State in relation to the registration and record of mortgages on personal property, shall apply to and affect all conditional sales of personal property as defined in this section." This statute, as we think, has no application, for the reason that there was no sale, conditional or absolute, to Goodyear, of property delivered to him under this contract. He was to receive, hold, sell, account, and pay over proceeds, less his compensation as agent. Cash sales by him, and none others, were contemplated. He was to pay over to his consignor a fixed sum out of the proceeds of any article sold as soon as the sale was made, and until that was done all the proceeds were to belong to the consignor, and each article was to remain in the consignee's hands on consignment till thus sold and paid for. Sale, payment by the purchaser, delivery to him and remittance to the consignor were to be simultaneous acts. We can see no indication that it was expected or intended that Goodyear should become the owner of the property or any of it at any time or on any condition whatever. If he had fraudulently converted any of it to his own use before sale, or had, after sale, failed to pay over the proceeds on demand, to the extent of invoice prices, we see not why he would not have been subject to indictment for larceny after a trust delegated, under section 4422 of the code. The onerous and unusual terms to which he assented in order to get the agency, did not convert the transaction into a purchase, conditional or otherwise. He was to pay all charges, keep the property insured for the consignor's benefit, and take upon himself all risk of its loss or damage from any cause

whatsoever. He agreed to do this in order to get the privilege of selling it as the consignee's agent, with the further privilege of retaining as his compensation the difference in price between what he might receive from purchasers and the invoice or contract price at which he was required to settle with his consignor. What this difference was or was likely to' be we know not, but he was the judge of its sufficiency, and we have no knowledge of any law or rule of public policy that would forbid him to assume whatever burdens he pleased, and measure his compensation for the whole, including his services in caring for and selling the property, by sharing in the proceeds of sale to the extent stipulated. An agent to sell might as well be paid by giving him the surplus proceeds over and above a fixed sum, as by allowing him a commission upon the gross proceeds. McCullough *v.* Porter, 4 W. & S. 177. Such a basis of compensation is perhaps unusual, but is not unlawful. In determining the nature of the contract, we should look at how it would work in practice on the assumption that its terms were complied with on both sides, according to the true intent and understanding of the parties. It seems to us clear that there was no design or purpose that Goodyear should ever become the owner of a single article of this property, but that his relation to it was to be and remain that of a bailee and agent for making sale of it, receiving the proceeds and paying over the same, less his share thereof, to his consignor, and that the latter was to be and remain the sole owner until the sale, and then instantly become the sole owner of the proceeds, and so remain until his share thereof was actually paid over to him, after which the residue would belong to Goodyear. This residue would not be fully earned by the latter until this last service had been rendered. The stipulation that if any of the goods were removed from the consignee's place of business

they should be paid for immediately, was not intended as a permission to remove them before they were sold and paid for, but to indicate the very contrary, and to make their disappearance from that place evidence as between the parties that they had been sold and ought to be represented by cash proceeds in the hands of the consignee. Whenever the consignor could not find an article of the goods where it ought to be, he would have a right under this stipulation to treat it as sold for cash, and call for the production of the money. The stipulation was designed as a check both upon credit sales, and upon putting any of the stock out of sight without having sold it.

None of the cases cited in the argument are fairly applicable to the present. Each one of those most nearly in point is distinguishable from it by some substantial and material element. In Bastress v. Chickering, 18 Ill. App. 198, notes were given at the end of each month for the price of all goods *received* during the month; the relation of debtor and creditor was established between the parties, and that these notes were called "advances" did not negative the theory of sale, especially as the invoices declared that the pianos "were bought and sold" upon conditions, and that customers engaged in selling them "were not agents in any sense known to the law." *In re* Linforth, 4 Sawyer, 370, the agreement was that the consignees would give their notes at sixty days from the dates fixed for rendering accounts of sales, and thus to settle for all goods sold or shipped from their warehouse, and with this further stipulation : to settle for such goods as might be on hand at the expiration of the year for which the contract was to run, by giving their note payable in six months, if so required. The great fact which seems to characterize this case is, that the consignees made themselves liable to pay ultimately for the goods whether

they were sold or unsold when the term of consignment expired, if the consignors so required. This would entitle the consignors to exact payment for unsold goods, and thus force the consignees to retain them as purchasers. Moreover the contest was not as to goods remaining unsold, the court saying : "No question is made as to the goods remaining in the bankrupt's possession at the time of the bankruptcy." The last fact is also true of Nutter *v.* Wheeler, 2 Lowell, 346. In Heryford *v.* Davis, 102 U. S. 235, notes were given for the price, with option to purchase within four months on payment of the notes. In Peek *v.* Heim, 127 Pa. St. 500, there was an absolute stipulation to pay at a fixed price within a given time or return the property at the expiration of that time. "There is nothing upon the face of the papers to indicate that Hill was to sell the pianos for the account of Peek & Son, as their factor. On the contrary, it was manifestly a sale to Hill with an agreement that the title was to remain in Peek & Son until the price was paid." In Hervey *v.* R. I. Locomotive. Works, 93 U. S. 664, the contract was in the form of a lease with an absolute agreement to pay rent partly in cash down and the balance covered by several promissory notes. This so-called rent was in fact purchase money. *Hays* v. *Jordan,* 85 *Ga.* 741. Although *Powell* v. *Brunner,* 86 *Ga.* 531, cites Nutter *v.* Wheeler, 2 Lowell, 346, *supra,* the citation was only for some of the *dicta* in the opinion of Lowell, J., in the latter case. The facts of the two cases were not alike. The decision in the former rests mainly on the fact that the mortgage was prior to the consignment. That this was rightly a controlling consideration, see United States *v.* New Orleans Railroad, 12 Wall. 362 ; Fosdick *v.* Schall, 99 U. S. 235 ; Fosdick *v.* Car Co., *Ib.* 256 ; Myer *v.* Car Co., 102 U. S. 1. Granting that in *Powell* v. *Brunner* there was a conditional sale, the prior mortgagee was affected by the

condition, for the mortgage could not take effect on property acquired by the mortgagor subsequently to its execution save in so far as he actually acquired it. As he had an option to purchase at a fixed price on paying the price, it might be held that delivery to him on such a contract was a conditional sale, but that would give the prior mortgage no absolute lien until the option was exercised on the stipulated terms. In the present case there was no option to purchase contemplated or provided for.

(a) The evidence, taken as a whole, is satisfactory that the goods now in controversy were all furnished to Goodyear· by the Emerson & Fisher Company for sale under the contract which we have been considering. That the invoices which accompanied the consigned goods said they were "sold" to him, some saying "terms contract," some "terms contract" and "terms spot cash," others "terms when sold" and one "terms . . . . . . . .," would not constrain a court or a jury to find that the invoices rather than the written contract represented the true nature of the transactions which took place under that contract. It is not uncommon for merchants and other dealers to make out bills, or put entries on their books, the letter of which is not accurately descriptive of their real agreements. Why they should do this, and persist in doing it, is hard to understand; but it would not be just to make them forfeit their substantial rights merely because they are prone to indulge in such foolishness. For my own part I heartily wish they would quit it, but am well aware they never will. For the sake of protecting them against their own folly, courts have to treat such loose and inaccurate bills as mere memoranda, and not take them as literally correct. They·are admissions which are not absolutely binding. They may be explained and put to silence by all the facts and circumstances characterizing the true import

of the dealings to which they refer.   Thompson *v.* Barnum, 49 Iowa, 392.   We are not to be understood as intimating that the mere letter of a contract purporting to be a contract of consignment is always to prevail. That species of contract, like any other, may be used as a false color to disguise a real sale.   We simply hold that there is no decisive evidence that it was so used in this instance.   Had the trial court found that the bills which were sent with the goods were literally true in saying the goods were sold, it would probably have been our duty to acquiesce in such finding.   But the belief of the trial court, in view of all the facts before it, was the other way; and this belief was warranted by the evidence.

4. What was the effect of taking Goodyear's notes for goods which he had sold, and for which, according to the terms of his contract, he ought to have paid in cash out of the proceeds of sale?   Did this vary the contract as to goods not sold, or was anything waived as to them by the consignor, the Emerson & Fisher Company? We think not.   Surely an agent to sell does not become a purchaser of unsold goods by his principal accepting notes for the price of goods which have been sold.   That this practice was pursued would bear on the question of whether there was a consignment for sale or a real sale in the beginning, but for any other purpose it would be irrelevant.   There is no suggestion in the evidence that any of the notes taken from Goodyear covered any part of the goods which he had failed to sell.   It has never been heard of as law that a principal may not settle with his agent, and take a note in lieu of cash for which the latter is liable, without breaking up the agency so far as business not yet transacted is concerned.   Such an adjustment would not convert the agent into a purchaser even as to goods sold by him for and on account of his principal, much less as to those remaining unsold.

5. It being ascertained that the receiver had no right to retain the property in controversy as the property of Goodyear, could he, before restoring it to the Emerson & Fisher Company, exact repayment of the amount ($242.25) which Goodyear had expended upon it for freight, storage and other expenses? The contract answers this question. It says, "all goods remaining unsold in said second party's hands are to be subject to the order of said first party free of all charges." No failure or fault is attributable to the "first party," the Emerson & Fisher Company. Goodyear, the "second party," was allowed opportunity to make his compensation and expenses out of these goods by selling them, but did not do so. He could not urge successfully this claim against his consignor, and we see not whence the receiver could derive the right if not from him.

There was no error. *Judgment affirmed.*