ARBUCKLE BROS. *v.* KIRKPATRICK.

(*Nashville.* February 17, 1897.)

1. CONTRACT. *How construed.*

The proper construction of a contract is not dependent on any name given to the instrument by the parties, or on any one provision, but upon the entire body of the contract and the legal effect of it as a whole. (*Post, p. 229.*)

Cases cited and approved: Cole *v.* Singer Mfg. Co., 4 Lea, 439; Cowan *v.* Singer Mfg. Co., 92 Tenn., 376; 102 U. S. Rep., 244.

2. TRUST. *Does not exist, when.*

No trust can be imposed upon funds or goods in the hands of an assignee for creditors, even if they were held by the assignor as an agent, unless they are kept separate and can be identified. (*Post, pp. 229, 230.*)

Cases cited and approved: Aiken *v.* Jones, 93 Tenn., 353; Sayles *v.* Cox, 95 Tenn., 579.

3. SALE. *What constitutes.*

A contract of sale transferring the title of the goods, and not a mere agency, is created by an agreement called "special selling factor appointment," under which the consignee is required to pay for the goods within sixty days, whether sold or not, at an amount fixed in advance, with certain allowances for carting, storing, insuring, and selling, whether the goods are carted, stored, insured, or sold or not, without requiring the consignee to make any account of sales or to keep the proceeds thereof separate, but giving him all the advantage and risk of the advancement or decline of prices. (*Post, pp. 223–225, 231–253.*)

FROM DAVIDSON.

Appeal from Chancery Court of Davidson County. THOS. H. MALONE, Ch.

---

Arbuckle Bros. *v.* Kirkpatrick.

---

J. C. McReynolds for Arbuckle Bros.

D. F. Wilkin, Hamilton Parks, and P. D. Maddin for Kirkpatrick.

Wilkes, J.    The complainants are dealers in Ariosa coffee, and claim that Kirkpatrick & Co. were their factors to sell this coffee.    Kirkpatrick & Co. failed April 5, 1896, and assigned all their accounts, goods on hand, etc., to Keith & Wilkin, to pay several classes of creditors—Arbuckle being in the tenth class.    Among the property so assigned were sums due to Kirkpatrick & Co. for Ariosa coffee sold by them, and not collected.    They had also collected considerable sums from these sales, and had used the money.    The bill seeks to reach:

1. All accounts for the coffee which Kirkpatick & Co. had not collected.

2. To impress a trust on all the assets assigned, for the sums which Kirkpatrick & Co. had collected from sales of Ariosa coffee before the assignment, and which they had used and appropriated.

No goods on hand are sought to be reached, because there was only about $65 worth on hand when the firm failed, and this was surrendered to Arbuckle's agent, before taking advice upon the contract, by the assignee.    The goods sold by Kirkpatrick & Co. were obtained from Arbuckle Bros. under a contract called a "Special Selling Factor Appointment."    The contract in question is . dated January 28, 1895.    A similar contract has been in

force between the parties for many years before that date. It is as follows:

"FORM C.

"SPECIAL SELLING FACTOR APPOINTMENT.
"ARBUCKLE BROTHERS.

"Subject to prompt acceptance, we take pleasure in appointing you a special selling factor for our roasted coffee, restricting and defining your duties and obligations by the following provisions, to wit:

"1. That all goods consigned on your requisitions on us, shall, until sold in regular course of business, and to *bona fide* retail customers, remain our property, with the title in us, and shall merely be held by you as our factor, and shall, at all times, be subject to our order for disposal or removal, on payment of all claims against them for advances of money made to us, and all charges for drayage, storage, and insurance.

"2. That you shall never purchase such goods for your own account.

"3. That such goods shall be sold and billed by you in your own name, but only as our factor, according to the laws relating to factors, and only at such prices and on such terms as we may give you from time to time.

"4. That you shall guarantee the sale of each consignment, and the payment therefor within sixty days from its date, and shall assume all risk as to the credit of the parties to whom you sell, and make all collections for goods sold, at your own expense.

" 5. That you shall remit us the full amount of each consignment, less the commission, as herein provided, by the end of such sixty days, at a price designated to you at the time of the consignment, whether the whole of said consignment shall have been sold by you or not, and whether or not you shall have collected the proceeds thereof.

" 6. That you shall insure us against any decline in the price of the unsold goods held by you as our factor.

" 7. That you shall be entitled to any advance in the price of such unsold goods; and,

" 8. That you shall be entitled to the following allowances and commissions, to wit: (1) For carting and storing, one-eighth cent per pound; (2) for insuring against fire, wind, and water, one-eighth cent per pound; (3) for insuring payment, one-eighth cent per pound; (4) for insuring against decline in price, one-eighth cent per pound; (5) for selling the goods, one cent per pound.

" 9. That, in addition to the above, we shall, on all advances made to us prior to ten days from date of consignment, allow a discount of one per cent., and on advances made after ten days, but prior to sixty days, we shall allow interest at the rate of six per cent. per annum for the time between date of said advance and said sixty days.

" 10. That if you neglect to remit to us the full amount of any consignment, less the commissions as herein provided, by the end of sixty days

from its date, we shall make draft upon you, and allow you a selling commission of only one-half of one cent per pound; and if said draft be returned unpaid, we shall only allow you a selling commission of one-fourth of one cent per pound; and if you do not remit us within four months from date of each consignment, no commissions or discounts of any nature whatever will be allowed.

"11. That you will maintain our established selling price, terms, conditions, and limitations of consignment in such States and Territories as may be designated by us; but in the event of any violation thereof, you are to pay to us the sum of fifty dollars ($50) for every such violation.

"12. That this factor appointment may be revoked by us at any time, at our option."

[Copyright, 1891, by Arbuckle Bros.]

This appointment was accepted by Kirkpatrick & Co., on January 28, 1895, in the following language:

"DEAR SIR: We beg to herewith accept your appointment as 'Special Selling Factor' of your roasted coffees, subject to all the provisions, limitations, and obligations expressed in your notice of appointment, Form C, dated at New York, January 28, 1895."

Under this contract, from February 5, 1895, to April 3, 1895, twenty-five different lots of five cases each of this coffee were received by Kirkpatrick & Co., the value of which was $3,041.70. The coffee was sold usually in one case lots, and almost daily, and Kirkpatrick & Co., before making their assign-

14 P—15

ment, April 6, 1895, had collected upon such sales $830.55, and used the proceeds in their business. Four cases were on hand when the assignment was made, and these were delivered up to the plaintiffs upon their demand by the assignee, as before stated. For the remainder there were accounts on the books of Kirkpatrick & Co. against their customers, and these accounts were transferred and went into the hands of the assignee. The accounts for coffee sold by Kirkpatrick to their customers were not kept separate from other items sold them, but the amounts and names of customers can be traced from the books by culling out the items relating to coffee. Kirkpatrick & Co. had never paid or advanced anything on consignments now in question, and complainants have received nothing thereon.

Complainants claim that Kirkpatrick & Co. were their "Special Selling Factors," so constituted by the written agreement above set out, and that coffee was consigned to and sold by Kirkpatrick & Co. as such. It is therefore maintained for them, (1) that the money collected by Kirkpatrick & Co., upon sales of coffee consigned to them, was complainants' money; and, as Kirkpatrick & Co. mingled same with their own, and finally used it in their business, the claim therefore is a preferred one, and must be first paid out of assets in hands of assignee; and, (2) complainants are entitled to follow into assignees' hands all unpaid accounts created for sales of Arbuckle coffee on or subsequent to February 5,

1895. Such indebtedness belongs to complainants because created upon sales of their goods by their factor.

These contentions were denied by the Chancellor and the Court of Chancery Appeals, the latter holding that the contract between the parties amounted, in legal effect, to a sale of the coffee to Kirkpatrick & Co. Complainants have appealed, and assigned the above-stated actions of Court below as error.

Defendants contend, on the other hand, (1) that the contract itself is a sale, and not an agency or factor contract. The mere name given it does not determine its status or effect. (2) That even if, under the contract, the title to the goods delivered to Kirkpatrick & Co. would remain in Arbuckle Brothers until they were sold by Kirkpatrick & Co., that, when sold, Kirkpatrick & Co. became mere debtors of Arbuckle Brothers for what was due for the coffee.

The correct determination of this case must depend upon the proper construction of the written agreement between the parties, and their course of dealing between themselves. Complainants claim that agreement above set out constituted Kirkpatrick & Co. their factors under a *del credere* commission, and that this firm in all things acted as such.

The Court of Chancery Appeals report that: "This firm operated under a previous contract with these complainants for several years. This prior contract was quite similar in its provisions to the one in this

case. It was slightly different in one or more of its terms, but the course of dealing of the parties between themselves, so far as we can see from the record, did not change in any particular material to the issue in dispute. The complainants had a warehouse in Nashville, with a man in charge of it, in which they kept a supply of their coffees. When the defendant firm wanted any coffee, it notified the agent of complainants of the quantity wanted, and it was supplied with a bill or statement, on a prescribed form, of the price and terms of the transfer or consignment, conforming in general outline with the provisions of the contract made with their merchants dealing in their coffees. When delivered, the firm sold the coffees, as it did other staple articles in its stock, to whom it pleased, when it pleased, and in whatever territory it pleased; and, so far as we can see, on whatever time it pleased. It rendered no account of sales to complainants, and was not called upon to do so. In its sales to its retail merchant customers, this coffee was sold and billed and shipped with other goods, and when its accounts were collected from its customers, embracing these coffees, the proceeds were deposited with the general funds of the firm, and paid out on its checks in meeting its current liabilities. For awhile the firm paid for this coffee by its checks upon its bank in the city of Nashville, just as it paid any other demand upon it. Upon objection being made to receiving these checks in payment, the firm opened an

account with a firm of New York bankers, and forwarded checks upon them to complainants in settlement; and these checks appear to have been received without question or objection until the assignment of the firm. The complainants never inquired whether their coffees were insured, or whether this firm paid for storage, or anything of the kind."

Other facts found by that Court have already been adverted to, and still others will be mentioned hereafter so far as necessary. Kirkpatrick & Co. are called in the contract "Special Selling Factors," and the instrument a "Special Selling Factor Appointment." Still, the proper construction of the contract is not dependent on any name given to the instrument by the parties, and not on any one provision, but upon the entire body of the contract and the legal effect of it as a whole. *Cole* v. *Singer Mfg. Co.*, 4 Lea, 439; *Cowan* v. *Singer Mfg. Co.*, 8 Pickle, 376; *Herriford* v. *Davis*, 102 U. S., 244.

We think it very evident that whether we regard the contract as one of sale, or simply one creating an agency to sell, is not material so far as the money already collected from sales and expended by Kirkpatrick & Co. is concerned. The amounts received by them for such sales have not been kept separate from their other funds, and it does not appear that any of the proceeds went into the hands of the assignee, or into the purchase of goods that came to his possession. These sums have been ex-

pended in the general business of Kirkpatrick & Co., but for what purpose does not appear, and they are not traced or identified, and cannot be. As to the money already paid in, Kirkpatrick & Co. are debtors; as they are for any other funds used by them from goods sold and not paid for, and this must be the case whether they received the proceeds of sale as their own or as agents; and unless they were kept separate and identified, no trust can be imposed upon the funds or goods in the assignee's hands. Story on Agency (8th Ed.), p. 290, Sec. 229; 3 Am. & Eng. Enc. L., 344, and cases cited; *Aiken* v. *Jones*, 9 Pickle, 353; *Sayles* v. *Cox*, 11 Pickle, 579.

The four cases on hand when the assignment was made, have been delivered up to complainants, and as to them there is now no controversy, and the only remaining question is, whether the amounts due Kirkpatrick & Co., on account for coffee sold, can be successfully claimed by complainants. If so, it can only be upon the theory that Kirkpatrick & Co. were the agents of Arbuckle Brothers, to sell their coffee, and on the theory that the proceeds after sale and before collection, as well as the coffee, before sale, remained the property of complainants. In determining this question, it is not material to consider whether the agency (if it be held to be such) is one of ordinary character, or whether the agents in this case occupy the status of factors under "*del credere* commission."

The Court of Chancery Appeals was of opinion that while there were many features of the contract that indicated agency on the part of Kirkpatrick & Co., there were others, and especially the fifth and sixth sections, which could only be construed as rendering the contract one of sale and not agency.

These two clauses, as will be seen, provide that Kirkpatrick & Co. shall remit, for all coffees, at the end of sixty days, whether sold or not, and whether the proceeds have been collected or not, and the firm is made to guarantee complainants against any decline in price, and entitled to any advance; and in the tenth clause, the complainants are authorized to draw drafts if remittances were not made in proper time. The learned Court of Chancery Appeals say, in substance, that complainants cannot receive the price of the goods and afterwards claim the goods themselves, and when the price is paid the property could no longer be claimed. It is insisted that these provisions in the contract cannot be considered, because, as a matter of fact, Kirkpatrick & Co. were not made liable for any coffees at the expiration of sixty days, nor were they called upon to make good any decline in price, and hence, the conditions allowing these sections to be looked to have not arisen. It is true, none of the funds involved in this case arise directly from the operation of these sections, but they are parts of the same entire contract, prescribe the rights and liabilities of the parties under the contingencies named, and must

be looked to in order to determine the real intent, force, and effect of the instrument. They are not detachable, nor to be considered alone, nor is the remainder of the contract to be considered without them.

We have been cited by the very able counsel of complainants to a large number of cases construing contracts more or less like the contract now under consideration, and it is claimed the principles laid down in them are conclusive in consideration of this contract.

Among the cases cited for complainants are: *Metropolitan National Bank* v. *Benedict*, 74 Fed. Rep., 182; *Burton* v. *Goodspeed*, 69 Ill., 237; *Norton* v. *Mellick*, 66 N. W. Rep., 780; *Walker* v. *Butterick*, 105 Mass., 237; *National Cordage Co.* v. *Sims*, 66 N. W. Rep., 514; *Sturm* v. *Boker*, 150 U. S., 312; *Lenz* v. *Harrison*, 36 N. E. Rep., 567; *Balderstone* v. *National Rubber Co.*, 18 R. I., 338 (49 Am. Rep., 772); *Bane's Safe and Lock Co.* v. *Blocks Bros.*, 38 W. Va., 158 (45 Am. Rep., 486); *National Bank* v. *Goodyear*, 90 Ga., 711 (16 S. E. Rep., 962); *Milburn Mfg. Co.* v. *Peak*, 34 S. W. Rep., 102; *Moline Plow Co.* v. *Rodgers*, 53 Kan., 473 (42 Am. St. Rep., 317).

We examine these cases with reference to the case now on trial.

*Metropolitan National Bank* v. *Benedict & Co.*, 74 Fed. Rep., 182, C. C. A., 8th Dist.:

Stern Auction and Commission Company agreed

with Benedict & Co., manufacturers of clothing, as follows: "We agree to realize for consignment of ready made clothing of Benedict & Co., as per memorandum received of its president, net prices as per same, without any charges of commissions, freight, or any other charges. We agree to keep amount of consignment at all times, until agreement expires, fully insured, and that no part of consignment shall remain unsold or unpaid by February 1, 1895; and we shall also be entitled, on any cash payment before February 1, 1895, to one and one-half $(1\frac{1}{2})$ per cent. a month for unexpired time."

In a contest between Benedict Company and parties claiming consigned clothing under bill of sale given in payment of debt due from commission company, it was held: "The contract between the Benedict Company and the Stern Auction and Commission Company was not a sale, but a contract of factorage. The stipulations of the contract are not appropriate to a contract of sale. If it was a sale, and the commission company acquired an absolute title, what concern was it of the Benedict Company when they were sold? When one merchant sells goods to another, the seller never requires the buyer to enter into a covenant that he will sell the goods within a specified time. Such a requirement is inconsistent with the dominion over the property which absolute ownership confers. The money to be paid by the commission company was not upon a sale of the goods to that company, but upon a sale of the

goods by that company. . . . The commission company covenanted that no part of the consignment should 'remain unsold or unpaid by February 1, 1895.' A failure to sell the goods and account for the same at the prices fixed within the time agreed upon, would be a breach of this covenant on the part of the commission company, for which the Benedict Company might recover damages. But such breach of the contract would not have the legal effect to convert the bailment into a sale. . . . The goods not sold would still remain the property of the Benedict Company. There is no provision in the contract for a change of title from the consignor to the consignee in any event. Tested by the written agreement, the contract was clearly one of bailment.''

In this case, while the goods were in store, the company failed and sold to the bank all its stock, expressly excepting the goods on hand on consignment. The president of the bank was notified that the Benedict goods would not be included in the sale, and a special clause in the bill of sale was inserted for the purpose of excluding them. The bank, however, claimed the goods, and Benedict & Co. sued for them. The Court said the parties had a right to put their own construction on the contract, and, when it was done in good faith, the Court would sustain the construction. It is well to note that the commission company were not to pay for the goods as on a purchase, but only to account

Arbuckle Bros. v. Kirkpatrick.

for the proceeds of sale at prices fixed by the contract. There was no stipulation to pay for the goods at a fixed time whether they were sold or not. In the case at bar the goods were to be paid for in sixty days, whether sold or not. It is not here claimed to be a matter for damages if sale is not made, but that it is an absolute engagement to pay, sale or no sale. In addition, the commission company expressly excepted the goods in controversy out of the transfer, while in the case at bar the accounts in controversy are expressly conveyed to the assignee.

*Burton* v. *Goodspeed*, 69 Ill., 237: Burton and Holbrook entered into a contract substantially as follows: Burton agreed to furnish Holbrook, afloat at his dock, anthracite coal. Holbrook agreed to receive, hoist from vessel, put it on dock, pay lake freight, and charge amount paid for all this against coal, and to receive for docking, screening, selling, and delivering, including his commissions, $1.50 per ton for coal delivered outside the yard, and $1 for that delivered on the yard, and an additional commission of fifty per cent. of net profits on sales. Holbrook also agreed to guarantee payment of sales, to advance Burton on coal as shipped $3 per ton, and pay over balance of proceeds of sales as coal was sold, not to sell below market price, to keep correct accounts, and to render statement each month.

The Court said: "The relation existing between

appellant, Burton, and Holbrook, by virtue of their contract, is neither that of vendor and vendee nor of partners. . . . There is nothing said about selling the coal or any interest in it to Holbrook, nor have we been able to find any language from which we can reasonably presume that the intention of the parties was to invest him with the ownership of the property. The fact that he was to receive a portion of the net profits on sales does not prove that he was a partner, as they were given merely as part of his compensation. We think, under the evidence, Holbrook was, as to the coals shipped him for sale by appellant, Burton, a factor or commission merchant.''

It is evident that this is an ordinary consignment contract. The agent was to render a correct account each month to his principal, showing amount of goods sold and prices, and did not have to pay for any goods until sold, and was only to guarantee such sales as he made, and the facts do not make it a contract similar to the one now under consideration.

*Norton* v. *Mellick*, 66 N. W. Rep., 780 (Iowa, 1896): Norton & Co. agreed to furnish Mellick certain brands of flour at specified prices, to be sold by Mellick for them, as their agent, at prices given. Mellick agreed to receive flour as agent of Norton & Co.; to pay freight and charges; to keep same in good order; to sell it at not less than given prices; to render accounts each thirty days, and

make remittances then of the money for all mer-
chandise sold.    Mellick further agreed to buy any
of the flour unsold at the end of ninety days at
prices given, and pay therefor; and it was also
agreed that title, ownership, and right of possession
of the flour should remain in Norton & Co. until
same should be paid for in full.

The Court said: "We think there ought to be
no question that the contract was a mere agency for
the sale of the flour.    It is expressly stated in the
first paragraph that the flour was to be sold by the
defendant for the plaintiffs, as their agent.    The
real inquiry is, What was the intention of the parties
to the contract?    That intention must prevail, and
when it is plainly and unequivocally expressed in
writing that it is an agency, and not a sale, and
the title does not pass, there is no room for con-
struction," etc.

This contract plainly provided that the agent
should render an account each month, and make re-
mittances for all merchandise sold.    The title to the
flour was to remain in the principal until sold, and
the agent stipulated to buy such as might be unsold
at the expiration of ninety days.    The flour was
destroyed by fire before the ninety days, and the
principal sued the agent for its value.    The Court
held he was not liable; that the contract was one
of agency.    There was no stipulation to guarantee
the principal against decline in prices nor to pay in
a fixed time for each lot of goods, whether sold

or not, but simply to buy at the end of ninety days.

*Walker* v. *Butterick,* 105 Mass., 237: There was a contract between parties as follows: Alexander & Co. are to take goods from Walker & Co., and to return to them, every thirty days, the amount of sales, at prices charged by Walker & Co., who will furnish Alexander & Co. all goods in their line. Alexander & Co. are worth, in real estate and money, $5,000. After receiving goods, Alexander & Co. made monthly remittances, stating, in substance, that, according to contract, they remitted sales for preceding thirty days. The goods were attached by creditors of Alexander & Co. Held: The terms of contract import a consignment, and not a sale.

This is a simple agency contract, and has none of the peculiar features of the contract now under consideration.

Where a contract provides for consignment of goods, to be sold on commission for prices fixed by consignor, and returns at stated periods, consignee guaranteeing payment thereof, the relation which the law implies is that of an agency, for sale upon a *del credere* commission, and not that of vendor and vendee.

In this case the contract provided that the twine, as well as the proceeds of its sale, should remain the property of the principal, the proceeds to be remitted on the first day of each month. There

was no obligation on the agent to buy any of the twine, or to sell it in any fixed time, and is a case of simple agency.

*Strum* v. *Boker*, 150 U. S., 312: The goods were consigned to the agent to be sold by him to the best advantage, the profits realized to be divided equally between the principal and agent, and all losses to be borne by the principal. All goods unsold were to be returned to the principal. The agent was to insure the goods, for the benefit of the principal, and to pay the freight. Held, that the contract was a bailment upon the terms stated. The contract contained none of the features of the Arbuckle contract.

*Lenz* v. *Harrison*, 36 N. E. Rep., 567: The contract provided that the first party appointed the second party his agent to sell wagons in Henry, Ill. The second party accepted the appointment, and agreed to pay all freight charges, taxes, make good any loss or damage by fire, house them; to sell only to persons of undoubted solvency, indorse all notes taken on sales, guaranteeing prompt payment when due; make sales requiring final payment within twelve months from date of invoice; to transmit to the first party, each day, all cash received from sales that day, and, on the last day of each month, render full account of all sales, and transmit same, with all notes taken, to first party. Also, if required by first party, will take all wagons unsold at end of year, and give note for them, but

this stipulation not to be a positive sale to second party unless this requirement is made by first party. Held to be a simple consignment.

*Balderston* v. *National Rubber Co.* (1893), 18 R. I., 338 (S. C., 49 Am. St. Rep., 772). The rubber company agreed to consign and deliver free, goods to B. & D. for sale and returns, to pay B. & D. five per cent. on net amount of sales as a commission and guaranty, and also interest on any sum which they (rubber company) might owe them. B. & D. agreed to receive goods on consignment, to use best efforts to sell to best advantage, to account to the rubber company for same at price obtained, to charge as commission and guaranty five per cent., and to advise as to goods needed. B. & D. also agreed to advance to rubber company at least $50,000 per month, upon basis of eighty per cent. market value of goods, at rate of interest specified. The prices for which B. & D. were to sell were to be fixed by the rubber company.

The Court held : This was an agreement to sell goods for the rubber company, under a *del credere* commission, the relation between parties being that of principal and factor. A factor who has made advances must first enforce his lien therefor against goods before looking to consignor. And, finally, a factor under a *del credere* commission is liable absolutely as a principal, and becomes a debtor to his consignor, if the debt is not paid by purchaser

when due; but the principal, notwithstanding liability of factor to him, may collect of his purchaser.

In this case it is to be noted that the rubber company was to pay all freights to Balderston's warehouse. Balderston was to use his best exertion to sell to the best advantage, and to account at the price received, less five per cent. There was no stipulation for a guarantee against decline in price, nor loss by fire or other cause, nor is there any guarantee to sell, or to pay until he did sell. The contract lacks many of the features of the present one.

*Barnes Safe & Lock Co. v. Block Bros.*, 38 W. Va., 158 (S. C., 45 Am. Rep., 486; S. C., 18, S. E. Rep., 482): The contract stipulated that the safe and lock company appointed the Globe Contract Company its agent to sell safes in certain territory on fixed commissions, and agreed to furnish the agent safes on consignment. The agent was to pay for safes when he sold them, and to diligently work the territory. The agent failed and his creditors levied on some of the safes in its charge unsold. The Court held that the safes were not the property of the agent. The contract contained none of the peculiar features of the Arbuckle contract.

*National Bank v. Goodyear*, 90 Ga., 711 (S. C., 16 S. E. Rep., 962): The contract contained stipulations that the agent should receive goods on consignment, to be sold by him as the agent of the consignor. The agent was to make monthly reports

14 P—16

of sales of goods on hand; the title to all unsold goods and all proceeds of sales to remain in the consignor; all articles to be settled for as soon as sold. The agent also agreed to insure, store, pay freight, and all charges, without expense to consignor, and have for his pay whatever the goods sold for above the invoice price. The consignor could terminate the agency at his option and retake all goods on hand. This was held a bailment and not a sale.

*Milburn Mfg. Co.* v. *Peak* (Texas, 1896), 34 S. W. Rep., 102: The contract provided that the Milburn Company appointed Hood & Co. its agent to sell vehicles. Hood & Co. were to make all reasonable efforts to sell same, and settle for all vehicles sold, take all notes for goods sold on credit, in the name of the Milburn Company, and remit to it all notes and cash received for the vehicles; the notes taken for the vehicles to be indorsed and guaranteed by Hood & Co. and paid, if the makers did not pay at maturity; the ownership of all vehicles and their proceeds of sales to remain in Milburn Company, and under no circumstances to be used by the agent. The contract is plainly very different from the Arbuckle contract.

*Moline Plow Co.* v. *Rodgers*, 53 Kan., 473 (42 Am. St. Rep., 317; 37 Pacif., 111): The contract provides that Underwood was appointed agent of Moline Plow Company, who agreed to consign him certain goods. The agent was to settle for all goods

received by him with farmers' notes taken for such goods as he should sell. The goods remaining unsold at the end of the season, the agent should either settle for with farmers' notes or store for the principal, at the principal's option. A few months later the agent absconded. The principal, after investigation, attached the goods on hand as the goods of the agent. Held: That he thereby elected to treat the goods as the agent's, and was bound by his election.

Defendants cite cases supporting their contentions, and these we have examined and comment upon.

*Ætna Powder Co.* v. *Hildebrand,* 137 Ind., 462 (S. C., 45 Am. St. Rep., 194): The powder company agreed to consign powder, paying freight, to H. & F., to sell as agents, at prices not below those fixed by the powder company, and to allow H. & F., for selling and guaranteeing sales, a given per cent. H. & F. agreed to act as agents, to guarantee sales, to adhere to prices, to make no charge except commissions stated, to make report of all sales at end of each sixty days, and to pay for same with their sixty-day note. Court and counsel for all parties agreed that this contract created H. & F. agents until a sale took place; then, the Court held, H. & F. became ordinary debtors of the consignors for the amount due them for goods at catalogue price.

This case cites the following as authorities sustaining a similar holding: *Nutter* v. *Wheeler*, Fed.

Cas., 10384; *Ex parte White*, 6 Chy. App., 397; *In re Linfuth*, Fed. Cas., 8369.

*Ex parte White*, L. R., 6 Chy. App. Cases (1871), 397: There was no written agreement between parties. The Court found the course of dealing was substantially this: N. was to dispose of goods sent him by T. & Co., and was not to pay for them unless he disposed of them. He was to return, at end of every month, an account of sales actually made, and, then, after lapse of another month, was to pay, in cash, for amount of goods which he so disposed of, according to values fixed by price list sent him. It does not appear that he ever was expected to return any particular contract or names of customers. He pursued his own course in dealing with goods, and frequently, before sale, manipulated them to a very considerable extent, by pressing, dyeing, and otherwise altering their character, changing them as much as wheat would be changed by being turned into flour; and he sold them on what terms he pleased as to price and credit. T. & Co. undertook to impose a trust on certain funds alleged to have been collected by N. upon sales of their goods.

The Court held: The course of dealing between parties was inconsistent with the idea that N. was dealing in a fiduciary character in respect to these goods, or that relation of vendor and purchaser existed between T. & Co. and parties to whom N. sold. The proceeds of sale were the moneys of N.

Mellish, S. J., said: "It appears to me that

the real question is, When N. sold the goods, did he sell them as the agent of T. & Co., so as to make T. & Co. the vendors and the persons to whom he sold purchasers from T. & Co., or did he sell on his own account, so as to create the relation of purchaser and vendor between himself and the persons to whom he sold? Now, it is said that he was a *del credere* agent; and no doubt it requires a very minute examination of the course of business to distinguish between a *del credere* agent and a person who is an agent up to a certain point—that is to say, until he has sold the goods, but who, when he has sold the goods, has purchased them on his own credit, and sold them again on his own account. . . . Now, if it had been his (N.'s) duty to sell to his customers at that price (the price fixed by T. & Co.), and to receive payment for them at that time, then the course of dealing would be consistent with his being merely a *del credere* agent. But, if the consignee is at liberty to sell at any price he likes, but is to be bound if he sells the goods to pay the consignor for them at a fixed price and time, in my opinion, whatever the parties may think, their relation is not that of principal and agent. The alleged agent, in such a case (as this), is making, on his own account, a contract of purchase with his alleged principal, and is again reselling.

*Nutter* v. *Wheeler*, 2 Lowell, 346 (1874); Fed. Cas., 10384, Dist. Ct., Mass.: W. & Co., manu-

facturers of tools, were in the habit of sending their goods to G., at his shop in B., who sold them at such prices, to such persons, on such terms, as he pleased. Whenever G. sold tools, he was to pay W., in thirty days, prices shown by the list, less agreed discount. W. had the right at any time to sell goods remaining in G.'s shop unsold; and G. was permitted to sell goods at factory of W., who then delivered them, and charged G. the trade price, less agreed discount. Instead of paying in thirty days, G. sometimes gave his note for balance due, one of which W. held at the time of G.'s bankruptcy. G. ordered three drills to be sent by W. to a customer. They were sent, and bill made out to G. as purchaser for trade price, less discount, and sent him in a letter, in which W. & Co. said they had taken off fifteen per cent., and hoped to get cash in thirty days. G. went into bankruptcy. The purchasers had not paid for drills, and W. & Co. collected price therefor. G.'s assignee brought this suit against them for money had and received.

Lowell, J., said, among other things: "It has been settled for a long time that, upon the bankruptcy of a factor, his principal may recover from the assignees any of the goods remaining unsold, or any proceeds of the sale of such goods which the assignees themselves have received, or which remain specially distinguishable from the mass of the bankrupt's property; . . . and it makes no difference

that the factor acted under a *del credere* commission or sold the goods in his own name. As to those goods sent to Boston, he (G.) may be described as a bailee, having power to sell as principal. But after the goods were sold, the agreement appears to have been that G.'s credit alone was looked to."

Relying upon the authority of *Ex parte White*, 6 Ch. App. Cases, 397, the Court finally said: "If the relation of the parties was such as I have considered it, then, even as to the goods which had been once consigned to G., he should be considered as the purchaser, subject only to the understanding that he was neither the owner of them nor liable to pay for them until he had succeeded in finding a purchaser; but when he did sell, he immediately became the principal, and the defendants ceased to have the rights of a consignor, and could not follow the goods or their proceeds as undisclosed principals."

*Ex parte Flannagans*, 12 National Bank Reg., 230; S. C., Fed. Cases, No. 4855 (1875), U. S. Dist. Ct., Va.: F. & Son, manufacturers, and R. & H., commission merchants, in 1873, agreed as follows: "We, F. & Son, propose to give you entire agency for Stonewall fertilizer at Norfolk and for ————, on condition you push sale and have proper man to look after it, and to allow you a commission of ten per cent. for sales and guarantee, we to draw on you at sight or short time for $30 a ton. The price to be sold at is $65 in Baltimore.

For balance, after paying $30, you to give your acceptances, say payable first December, 1873, accounts to be rendered and settlement after selling season is over, no charge to be made for storage during the season. Any guano left over and not sold is to be at the risk and on our account. We agree to furnish the guano delivered in Baltimore, one hundred tons to be delivered in —–—— and balance as ordered —–——. Will ship in lots to any point you may direct."

R. & H. accepted the above. The Court held that, under authority of *Ex parte White*, L. R., 6 Ch. App., 397, and Story on Agency, Sec. 215, consignments under above contract were sales, and not shipments under a *del credere* guaranty. The Judge held R. & H. were primarily liable to F. & Son for a fixed price on their acceptances, and that they might sell to planters at a different price, and then stated that "the now well-settled law of *del credere* guaranty is, that the factor is not the primary debtor; that his engagement is merely to pay the debt, if it is not punctually paid by the person to whom he sells" (citing Story on Agency, Sec. 215), and held that, therefore, R. & H. were not factors, but purchasers.

*In re Linforth*, 4 Saw., 370, Cir. Ct. Cal. Fed. Cases, 8369 (1877): June 1, 1876, F. agreed to furnish L. such manufactured goods as he should order, to allow L. certain specified discounts from price lists, and to give L. exclusive sale of such

goods. L. agreed to pay freight charges, etc., on goods shipped, to insure, at his own cost, for benefit of F., to render account of sales every three months, and to settle for all goods sold or shipped from his (L's.) warehouse, by giving his note, payable in sixty days from date fixed for rendering account of sales, as provided. L. further agreed to settle for such goods as might be on hand June 1, 1877, by giving notes, payable in six months, if so required by F. F. agreed to allow additional discount for all cash paid in advance of times specified. The Court held that transactions under this contract were sales on a credit. Citing *Nutter* v. *Wheeler*, and *Ex parte White, supra.*

*Gindre* v. *Kean*, 28 N. Y. Supp., p. 7 (1894):

The suit arose out of an effort by principals to recover of the assignee in insolvency of their *del credere* agent the amounts due for goods furnished him, and which he had sold. The principle is tersely stated by Brischoff, J., at p. 7, as follows: "The principles which should control the decision of the case at bar, and which are to be deduced from the adjudged cases are, that whenever the agreement of the alleged principal and factor, whatever they may style themselves or their relation, and whether the agreement be express or only inferable from the course of business, clearly manifests an intention that the alleged factor shall become definitely and primarily liable, upon a sale, for the purchase price of the goods consigned, it is, in legal effect, a sale by

the alleged principal to the alleged factor, out of which arises the ordinary relation of debtor and creditor. The liability of the alleged factor, under such an agreement, is repugnant to that of a mere agent, whose duty to remit is commensurate only with the amount of the money which he has actually received upon a sale for his principal's account." The Court cites the case of *Linforth, Nutter* v. *Wheeler* and *Ex parte White* with approval.

Without attempting to run a parallel between the present case and those which have been cited and commented upon, we merely state some of the more prominent features which we think characterize this contract as one of sale, and not of agency. It will be noted that under no circumstances were any goods ever to be returned to Arbuckle & Co.; all must be paid for in sixty days, whether sold or not. There is no stipulation to buy at the expiration of sixty days, but the contract clearly contemplates a payment without further bargain when that time arrives, and implies a present sale, on a credit of sixty days. Kirkpatrick & Co. could sell when and on what time they chose, but no matter how sales were made, the amount to be paid was fixed in advance, whether sold or not, whether collected or not. No account of sales was to be rendered. Arbuckle & Co. had nothing to do with Kirkpatrick & Co.'s customers. They were not in privity with complainants, and no credit was given to them. If cash was taken, it was not to be kept separate.

If notes were taken, Arbuckle & Co. had no concern in them. Kirkpatrick & Co. were to have all advance in prices and bear all declines; if the goods were destroyed by fire, wind, or water, it was the loss of Kirkpatrick & Co., and the insurance was optional, and only designed to place them in position to account for the goods.

Whether the goods were carted or stored · or insured was optional with Kirkpatrick & Co., but in any event they were to be credited therefor. They were allowed a sum for commissions, whether they sold or not, and discount was to be allowed for quick payment, as is usual in case of sales. The course of dealing shows that the proceeds of sale were not to be kept separate, but Kirkpatrick & Co. remitted their check on general account, and it was accepted without question or comment. This was a virtual agreement that Kirkpatrick & Co. might use the proceeds as they chose, and account for them out of their general funds. These features are all evidences of a sale, and cover every risk, obligation, and duty that rests upon a purchaser, and cover every right in handling the goods that an owner could have, except simply the price was to be sustained. This was evidently provided in order to keep the price uniform in all markets and stifle competition.

Kirkpatrick & Co. could sell in any territory, in any amount, to any purchaser, on any terms, for cash or credit, take notes or make accounts, and dis-

pose of the goods as absolutely and free of limitation as any owner could, except they could not vary the price. In *Nutter* v. *Wheeler, supra,* it is said that a stipulation that a vendee or consignee shall not sell below a fixed price is a very common one, made to prevent competition, and has but little weight in determining the question of sale or agency, and is consistent with either.

We are of opinion that complainant cannot collect from customers of Kirkpatrick & Co., but must look alone to them, and not to purchasers from them, and we are also of opinion that under the peculiar provisions of this contract, the relation of complainant to Kirkpatrick & Co. was that of vendor to vendee, at least as to outsiders and persons to be affected by the relation, no matter what the parties may have agreed or intended as between themselves. The contract is certainly a remarkable one, partaking in many of its provisions of a contract of agency and in many others of a sale. It is evidently intended as either or both, as might suit the convenience or subserve the purposes of the complainants. It purports to be copyrighted, for what reason is not stated, but the copyright is evidently procured on account of the unusual and extraordinary provisions of the instrument (if there be a copyright).

In construing such a contract, whenever it affects the rights of others, it will be so construed as to protect such rights, and not to enable the complain-

ants to carry out any double purpose. In view of its uncertainty and contradictory provisions, the Court will see that third persons are not prejudiced by its construction. The decree of the Court of Chancery Appeals is therefore affirmed.