## In re MULLIGAN.

### (District Court, D. Massachusetts. August 1, 1902.)

#### No. 4,916.

**1. BANKRUPTCY—TRUST FUNDS—LIEN OF CESTUI—NECESSITY OF TRACING FUNDS.**
Where a bankrupt, having possession of the property of another, with authority to sell on account of the owner, the proceeds to be immediately handed to such owner, sold the property, and delivered the proceeds, with a larger sum of other money, to a broker, where the most of it was lost in stock speculations, and there is no evidence that the stocks remaining in the hands of the broker and recovered by the trustee of the bankrupt were purchased with such proceeds, such owner has no lien on such stocks as against the trustee.

**2. SAME.**
Where a bankrupt, having possession of the property of another, with authority to sell on account of the owner, and pay the proceeds to him, sold the property, and deposited the proceeds in a bank to such bankrupt's own account, which included his own money and an unascertainable amount of other trust funds, though more than such proceeds, and afterwards checked out the moneys until there was less remaining than such proceeds, such owner cannot establish a lien on the whole or any part of the balance of such account remaining in such bank.

**3. SAME—PETITION FOR LIEN—PLEADING.**
On the hearing of a petition by a creditor of a bankrupt to be awarded a lien on certain assets on the ground that they were derived from trust funds belonging to such creditor, the trustee may oppose the petition without pleading.

In Bankruptcy.

J. B. Warner and Pierpont L. Stackpole, for creditors.
Johnson, Clapp & Underwood, for trustee.

LOWELL, District Judge. First Transaction. Brown Bros., the petitioners in this proceeding, issued letter of credit N477 to the bankrupt, stated to be for cost of skins, the bills of lading for which were to be filled up to Brown Bros. Pursuant thereto, a bill of exchange was drawn on Brown Bros., and paid by them. Bills of lading were made out to them, and they received the skins on arrival at Boston as their own property. These they delivered to the bankrupt on February 11, 1901, and took from him a "trust receipt" as follows:

Trust Receipt.

Received from Brown Brothers & Co. the following goods and merchandise, their property, specified in the bill of lading, per Cambrian, dated London, January 26, 1901, marked and numbered as follows:

$$\overline{(\text{cue})}$$    1254/1256
        1260/1264
        1269/1273
        1278/1280=16B

—And, in consideration thereof, ($\frac{I}{we}$) hereby agree to hold said goods in trust for them, and as their property, with liberty to sell the same for their account, and further agree, in case of sale, to hand the proceeds to them to apply against the acceptances of Brown, Shipley &·Co., on ($\frac{my}{our}$) account under the terms of letter of credit No. N477, issued for ($\frac{my}{our}$) account, and for the payment of any other indebtedness of ($\frac{mine}{ours}$) to Brown, Shipley & Co., or Brown Brothers & Co. Brown Brothers & Co. may at any time cancel this trust and take possession of said goods, or of the proceeds of such of the same as may then have been sold, wherever the said goods or proceeds may then be found; and in the event of any suspension, or failure, or assignment for benefit of creditors on ($\frac{my}{our}$) part, or of the non-fulfillment of any obligation, or of the nonpayment at maturity of any acceptance made by ($\frac{me}{us}$) under said credit, or under any other credit issued by Brown Brothers & Co. or Brown, Shipley & Co. on ($\frac{my}{our}$) account, or of any indebtedness on ($\frac{my}{our}$) part to either of them, all obligations, acceptances, indebtedness, and liabilities whatsoever shall thereupon (with or without . notice)· mature, and become due and payable. The said goods while in ($\frac{my}{our}$) hands shall be fully insured against loss by fire.

Dated Boston, Feb. 11, 1901.
    [Signed]                        B. J. Mulligan.
£818—2—6.

The bankrupt sold the skins on April 16th, and received in payment therefor two checks,—one of $4,000, and one of $216.11. Brown Bros. had no knowledge of the sale until after a general assignment made by the bankrupt on May 20th. The bankrupt had already been speculating in stocks through Hornblower, a broker, and between March 1st and May 20th paid him about $13,000 for stocks carried on a margin. As one of these payments the bankrupt indorsed and delivered to Hornblower the check for $4,000 before mentioned. Hornblower deposited this check in his bank, and it was duly paid. Hornblower had no knowledge for what the check was given. The petition in bankruptcy ·was filed July 10, 1901. Subsequent to the appointment of the trustee ·in bankruptcy, Hornblower sold some of the stocks which he held as security for the bankrupt's debt to him. After this debt was paid, there remained certain other stocks and a cash balance. On December 7th the trustee in bankruptcy sold for $1,100 his right, title, and interest as. trustee in and to the cash balance and remaining stocks mentioned. This sum the petitioners seek to recover from him. The sale was. duly confirmed by the referee, but· Brown Bros. had no notice of the sale before the filing of the petition here under consideration on January 25, 1902. The disposition of the second check for $216.11 is stated in the account of the second transaction.

Ordinarily speaking, the legal owner of property may reclaim it from those into whose hands it has come. So one who is not the

legal owner of property, but is recognized by a court of equity as beneficially entitled to it, may reclaim it, with the aid of a court of equity, from any one whose subsequently acquired equitable title is no better than his. This principle applies to relations other than that of ordinary cestui que trust and trustee. Here Brown Bros. were the legal owners of the skins, and their equitable right to the money received from the sale of the skins is such that they may recover that money from any one whose equitable right in it is not superior to theirs. Their right is superior to that of the general creditors of the bankrupt and of the trustee in bankruptcy, who represents such creditors. Frith v. Cartland, 2 Hen. & M. 417; Id. 34 Law J. Ch. 301. If, then, the check for $4,000 given by the purchaser of the skins to the bankrupt and delivered by the bankrupt to Hornblower were still in Hornblower's possession, Brown Bros. could procure the delivery of that check to themselves, subject to Hornblower's equitable rights, whatever those might be. Equity does not regard the form under which the cestui's property exists. Not only the actual trust property itself, but any property substituted for it, or into which it has been converted, may be recovered. Thus, if Hornblower had purchased particular stocks with the $4,000 check, and if he still held those stocks, they would, subject to his rights, and as against the trustee in bankruptcy, be reclaimable by Brown Bros. However improper the substitution or conversion by the trustee, yet the cestui may ratify it, and claim the investment for his own. Still again, if the trust fund has been mingled with funds which belong to the defaulting trustee, and the mingled mass has been converted into property which exists in specie, the cestui has a claim upon this property by way of lien for the replacement of the trust fund advanced for the purchase, or by way of equitable ownership of an aliquot part of the property, either or both. For the purposes of this discussion, it matters not which. This principle is apparently questioned in Litchfield v. Ballou, 114 U. S. 190, 195, 5 Sup. Ct. 820, 29 L. Ed. 132; but the doubt must be limited to the particular case, as the principle has been abundantly recognized. The recognition has been most complete where the trustee has mingled in one bank deposit the trust fund and moneys of his own. Whatever may have been his actual intention, he will be presumed to have acted honestly, so far as the state of the account allows the presumption. His drafts against the deposit thus mingled are taken to be applied to his own share of the deposit until that share is exhausted, and what is left is taken to belong in equity to the cestui que trust. The rule thus stated is not undisputed (see Steamboat Co. v. Locke, 73 Me. 370), but it is supported by the weight of authority (Bank v. Peters, 123 N. Y. 272, 25 N. E. 319; Mercantile Trust Co. v. St. Louis & S. F. R. Co. [C. C.] 99 Fed. 485; Bank v. Roller, 85 Md. 495, 37 Atl. 30, 36 L. R. A. 767, 60 Am. St. Rep. 344; In re Hallett's Estate, 13 Ch. Div. 696; McMahon v. Fetherstonhaugh [1895] 1 Ir. R. 83). In some cases, indeed, this rule concerning bank deposits has been extended to cases in which the bank itself is the defaulting trustee. The cestui has sometimes been allowed a charge prior to that of the general creditors upon the general cash assets of the defaulting bank, or upon the minimum value of these cash assets since the date

of the trust deposit. If since that date the cash assets have at any time fallen below the amount of the trust deposit, it has been held that the trust fund has been finally dissipated to that extent. Merchants' Bank v. School Dist., 36 C. C. A. 432, 94 Fed. 705; Commissioners v. Wilkinson, 119 Mich. 655, 78 N. W. 893, 44 L. R. A. 493; Bank v. Weems, 69 Tex. 489, 6 S. W. 802, 5 Am. St. Rep. 85. See Bank v. Dowd (C. C.) 38 Fed. 172, 2 L. R. A. 480; Appeal of Carmany, 166 Pa. 622, 31 Atl. 334.

On the other hand, the mere misapplication of trust funds does not create in favor of the defrauded beneficiary a claim upon the general estate of the defrauding trustee superior to that of his general creditors. There are some cases, indeed, which give to the beneficiary a general priority, or something very near it; but they are opposed to the great weight of authority. Other cases do not give to the defrauded beneficiary, merely as such, a general priority, yet allow him a prior charge upon the general assets of the defrauded trustee, where it is shown that the trust fund has been absorbed in the trustee's business or general estate, though it cannot be followed into any specific property remaining. Some of these latter cases distinguish between a dissipation of the trust fund, as in the payment of the trustee's debts, and an employment of the fund in the purchase of property; but, if the purchased property cannot be traced, there would seem to be no material difference. It might be possible, indeed, to require the general creditors of the defaulting trustee, in order to defeat the prior claim of the cestui upon any remaining property, to show affirmatively that the trust fund was not converted into the specific piece of property upon which the cestui seeks to enforce a lien; but to change the cestui's claim for priority into a mere shifting of the burden of proof, finds no considerable support in the decided cases. Some of the cases which give to the cestui a prior claim upon the trustee's estate without affirmative proof that the trust fund was converted into specific property still remaining have been overruled, as McLeod v. Evans, 66 Wis. 401, 28 N. W. 173, 214, 57 Am. Rep. 287, by Nonotuck Co. v. Flanders, 87 Wis. 237, 58 N. W. 383. Others have been explained away, as People v. Bank, 96 N. Y. 32, by Cavin v. Gleason, 105 N. Y. 256, 11 N. E. 504. Others lay down the law which still governs in their several states. Harrison v. Smith, 83 Mo. 210, 53 Am. Rep. 571; Hopkins v. Benn, 24 Colo. 502, 52 Pac. 670, 65 Am. St. Rep. 238; Peak v. Ellicott, 30 Kan. 156, 1 Pac. 499, 46 Am. Rep. 90; Plow Co. v. Lamp, 80 Iowa, 722, 45 N. W. 1049, 20 Am. St. Rep. 442; Smith v. Combs, 49 N. J. Eq. 420, 24 Atl. 9. See San Diego Co. v. California Nat. Bank (C. C.) 52 Fed. 59. But these cases are opposed to the weight of authority. Peters v. Bain, 133 U. S. 670, 693, 10 Sup. Ct. 354, 33 L. Ed. 696; Gianella v. Momsen, 90 Wis. 476, 63 N. W. 1018; Byrne v. Byrne, 113 Cal. 294; Ferchen v. Arndt, 26 Or. 121, 37 Pac. 161, 29 L. R. A. 664, 46 Am. St. Rep. 603; Arbuckle v. Kirkpatrick, 98 Tenn. 221, 39 S. W. 3, 36 L. R. A. 285, 60 Am. St. Rep. 854; Little v. Chadwick, 151 Mass. 109, 23 N. E. 1005, 7 L. R. A. 570; Steamship Co. v. Locke, 73 Me. 370; Slater v. Oriental Mills, 18 R. I. 352, 27 Atl. 443; Bank v. Weems, 69 Tex. 489, 6 S. W. 802, 5 Am. St. Rep. 85; Lewin, Trusts, p. 1095. The burden of tracing the trust fund into the property

claimed rests upon the beneficiary who claims it. He may be assisted in bearing this burden by the legal presumption above mentioned concerning the application of checks drawn against a bank account; but the burden of proof is upon him. The priority already referred to which has sometimes been given to the cestui in the application of the cash assets of a bank which has mingled the trust fund with its own funds, whether defensible or not, is limited to the case of the cash assets of a bank, and is not extended to other kinds of defaulting trustees or to other assets of the bank.

Have the petitioners shown affirmatively that their check for $4,000 was converted, in whole or in part, into the balance of the Hornblower account due the bankrupt? If the check had been the only payment made by the bankrupt to Hornblower, then it would follow that the balance due the bankrupt, and the stocks which partly composed it, belong in equity to the petitioners; but as the case stands there is no proof of what has become of their money. It may have been applied to pay a liability of the bankrupt outstanding at the time Hornblower got the check. It may have been lost in some particular gambling operation. This is not the case of a bank account, which, as has been said, is affected by a rather artificial rule. Moreover, there is no proof that the requirements of that artificial rule have here been met. At some time after the check was handed to Hornblower, the balance of the account may have been against the bankrupt, and an adverse balance at any time after the trust deposit is made destroys the claim of the cestui upon a bank account in which trust funds and private funds have been mingled. That the funds were mingled, not by the bankrupt himself, but by his broker, does not give Brown Bros. a better claim. The bankrupt's account with Hornblower, varying from day to day, cannot be treated as a single specific piece of property upon which the petitioners have a charge, because some of their money once went into the account. The trust fund can no longer be traced, though the act of mingling was that of the bankrupt's agent, creditor, or debtor.

It is not necessary to discuss the other objections made to the petitioners' recovery. As to the Hornblower balance, the judgment of the referee is affirmed.

### Second Transaction.

Another bill of exchange was drawn upon and paid by Brown Bros., and another consignment of skins came into their hands and became their property. These they delivered to the bankrupt upon a trust receipt for manufacturers, as follows:

### Trust Receipt.
#### (For Manufacturers.)

Received from Brown Brothers & Co. the following goods and merchandise, their property, specified in the bill of lading, per Noranmore, dated London, Feb. 12, 1901, marked and numbered as follows:

(cue)

(14) Fourteen bales skins.

—And, in consideration thereof, ($\frac{I}{we}$) hereby agree to hold said goods in trust for them, and as their property, with liberty to sell the same for their account; and further agree, in case of sale, to hand the proceeds to them, to apply

against the acceptances of Brown, Shipley & Co. on ($\frac{my}{our}$) account under the terms of letter of credit No. N477, issued for ($\frac{my}{our}$) account, or for the payment of any indebtedness of ($\frac{mine}{ours}$) to Brown, Shipley & Co. or Brown Brothers & Co. It is also understood that ($\frac{I}{we}$) have permission to manufacture and remanufacture the above property, identifying the product, and to sell the product of the same on the terms above mentioned. When in manufacture or remanufacture the product can no longer be identified, ($\frac{I}{we}$) agree thereupon to keep and hold in trust for Brown Brothers & Co., and as their property, manufactured goods of equal value with the property originally delivered to ($\frac{me}{us}$), and ($\frac{I}{we}$) will, on demand, deliver the same to them. Brown Brothers & Co. may cancel this trust at any time, and repossess themselves of their said property, In whatever condition it may then be, or of the proceeds thereof if sold, or of the manufactured goods of equal value above referred to, or their proceeds, wherever the same may be found. And in the event of any suspension, or failure, or assignment for benefit of creditors on ($\frac{my}{our}$) part, or of the nonfulfillment of any obligation or of the nonpayment at maturity of any acceptance made by ($\frac{me}{us}$) under the above-mentioned credit, or under any other credit issued by Brown Brothers & Co. or Brown, Shipley & Co. on ($\frac{my}{our}$) account, or of any indebtedness on ($\frac{my}{our}$) part to either of them, all obligations, acceptances, indebtedness, and liabilities whatsoever shall thereupon (with or without notice) mature and become due and payable. ($\frac{I}{we}$) further agree that the said goods, while in ($\frac{my}{our}$) hands, shall be fully insured against loss by fire.

Dated Salem, March 5, 1901.

[Signed]             B. J. Mulligan.
£729—18—6.

On March 20th the bankrupt sold these skins, and received in payment a check for $3,427.89, which he deposited in the Mercantile Bank on the same day. Brown Bros. had no notice of the sale until after the bankrupt's general assignment, May 20th. The bankrupt made other deposits from time to time to his bank account, and drew checks against it. On April 6th the account was at its lowest, $333.40. On April 27th the check of $216.11 mentioned in the first transaction was deposited to this account, and thereafter it was never reduced below $549.51 (the sum of $333.40 and $216.11). At the time of the general assignment it was $735.15. March 22d Moors delivered skins worth $6,620.73 to bankrupt upon another sort of trust receipt, as follows:

| Amount. | No. of Credit. | Due in London. | Due in Boston. |
|---|---|---|---|
| £1341.4/3 | 2907K | June 28/01. | June 18/01. |

Boston, Mar. 22, 1901.

Received from J. B. Moors & Co., Boston, acting on behalf of Kleinwort, Sons & Co., London, and themselves, the following described merchandise belonging to them, specified in bill of lading, per S. S. Castro, dated Copenhagen, Feb. 21/01, viz.:

M W M 200) Six Hundred
E S 400) Bundles Skins

—Which we hereby agree to hold in trust or on storage as their property, with proper insurance, which shall be paid to them in case of loss, but with liberty to manufacture said merchandise into leather at my Salem factory, to be marked and known as "Lot No. 17," for account of said J. B. Moors & Co.; and we further hereby agree to deliver to the said J. B. Moors & Co., or Kleinwort, Sons & Co., the proceeds of any sale of said merchandise (whether in notes, or cash, or other merchandise), the same to be applied by them, in the first place, toward the payment of any drafts or acceptances under letter of credit No. 2907K, issued by them for our account, and, secondly, to the payment of any other indebtedness from us to the said J. B. Moors & Co., with the further understanding that neither

the said J. B. Moors & Co. nor said Kleinwort, Sons & Co. are to be chargeable with any expense incurred on said merchandise; the intention of this agreement being to protect and preserve unimpaired the title and ownership of said J. B. Moors & Co. or said Kleinwort, Sons & Co. in said merchandise and the proceeds thereof.

[Signed]                                B. J. Mulligan.

For the most part the delivery to the bankrupt seems to have been for the purpose of tanning, and the title remained in Moors. On May 8th the bankrupt deposited to his bank account before mentioned $605.48, the proceeds of skins sold after April 18th, and on May 10th deposited a check for $3,700, the proceeds of skins sold after April 18th. I find that these three payments were made for skins of which a part, and probably a large part, were the Moors skins. Just how many Moors skins were thus included cannot be ascertained. Apart from the Moors transaction, the petitioners are entitled to $549.51, on the authority of Hallett's Case, 13 Ch. Div. 696, and many others, cited above. Trust funds were mingled with the individual funds of the bankrupt. The rule of Clayton's Case, 1 Mer. 572, viz., that checks drawn are to be charged against deposits according to the priority of the latter, does not apply as between the cestui and the defaulting trustee. Hallett's Case, above cited; Bank v. Peters, 123 N. Y. 272, 25 N. E. 319. More than $549.51 the petitioners do not claim, and could not recover in any event, because at some time after the trust deposit was made the bank account was drawn down to that amount, and so the rest of the trust deposit must be taken to have been finally dissipated. But here Brown Bros.' funds were mingled, not only with the private funds of the bankrupt, but with the trust fund of Moors. The precise amount of Moors' money which went into the bank account cannot be ascertained, but undoubtedly it was large. For want of ascertainment, Moors may not be able to establish a lien upon the bank deposit, but cannot the trustee avail himself of the Moors transaction in order to protect the general creditors, of whom Moors is one? Let us suppose a bank account in which $1,000 is left. Into this account has gone $1,000 of moneys belonging to an ascertained trust fund, A, and $5,000 of moneys mingled in unascertained proportions, but so that a large—probably the larger—part of the $5,000 belongs to another trust fund, B. The trustee's estate is insolvent. As against the trustee's private funds, trust fund A. may be entitled to the whole $1,000. Trust fund B may not be able to establish any claim to the $1,000 prior to that of the general creditors, for want of definite ascertainment of its moneys which have gone into the bank account. But as against fund B, is it possible that fund A can take the whole $1,000 because its contribution can be definitely ascertained, and B's contribution, though manifestly greater, cannot be ascertained definitely? I think not, and that the $1,000 must be shared between A and B either (1) proportionately, or (2) according to the rule in Clayton's Case, or else (3) all claims of priority must be rejected, and the fund made subject to the claims of all creditors, including A and B. The case supposed is practically the case at bar. Moors has contributed to the bank account more than Brown Bros. How much more has not been proved. As between Moors and Brown

Bros., the latter would get nothing according to the rule in Clayton's Case (see In re Stenning [1895] 2 Ch. 433), and but little by a proportionate distribution. Moors either cannot establish a definite claim to priority, or else has not chosen to do so; but the trustee in bankruptcy seeks to rely upon the Moors transaction for the benefit of the general creditors, including Moors. The burden of proof is upon the petitioners to trace their moneys into the existing balance of the bankrupt's bank account. They seek to do so by the artificial presumption that the checks drawn against the bank should be applied to that part of the deposits to which they did not contribute. It may be reasonable that a trustee should be deemed to draw his checks against that part of a mingled account which is his own. It is unreasonable that he should be deemed to draw his checks with the invariable intent to defraud cestui B rather than cestui A. It is none the less unreasonable when the share of cestui B, though larger than that of cestui A, yet cannot be ascertained so definitely. In my judgment, the petitioners have not sustained the burden of proof, and so their petition must be dismissed, and they, like Moors, must be left to come in with the general creditors. In re Stenning [1895] 2 Ch. 433, 436, 437. In Bank v. Peters, 123 N. Y. 272, 279, 280, 25 N. E. 319, the court found that the receiver, the representative of the general creditors, had not properly set up in his answer the fraud committed upon the creditors, whose position in that case was like the position of Moors in this. In the case at bar there were no pleadings subsequent to the petition, but the contention of the trustee in bankruptcy was sufficiently made.

As to the bank balance, also, the judgment of the referee is affirmed.